Filed 5/9/13  P. v. Hayes CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E053716 |
| v. | (Super.Ct.No. SWF027093) |
| JUSTIN TYME HAYES et al., | O P I N I O N |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  F. Paul Dickerson III, Judge.  Affirmed with directions.

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant Justin Tyme Hayes.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant Derek Shane O'Brien.

Diane E. Berley, under appointment by the Court of Appeal, for Defendant and Appellant Mark Anthony Wisler.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Melissa Mandel and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

## I.  INTRODUCTION

Defendants and appellants, Justin Tyme Hayes, Derek Shane O'Brien, and Mark Anthony Wisler, are members or associates of the Coors Skins (Coors), a White supremacist gang.  On an evening in November 2008, they, among others, beat a Hispanic man into a coma.  Separate juries convicted them of attempted murder, active participation in a criminal street gang, and assault by means of force likely to cause great bodily injury.  Each jury also found true allegations that defendants personally inflicted great bodily injury and that the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang.  Wisler's jury found true the allegation that the attempted murder was premeditated and deliberate; Hayes's jury and O'Brien's jury found the same allegation not true.  Hayes and O'Brien were each sentenced to prison for 22 years 8 months.  Wisler was sentenced to a prison term of 21 years to life.

Each defendant contends (or joins in the contentions of his codefendants) that the court erred by:  (1) denying a motion to sever the gang participation count and bifurcate the trial of the gang enhancement allegations; (2) allowing a gang expert to testify as to allegedly inflammatory gang-related evidence; (3) instructing the jury on aiding and abetting and the natural and probable consequences doctrine; and (4) failing to stay the

2

sentence on the gang participation conviction under Penal Code section 654.[1]  In addition, Wisler contends the evidence was insufficient to support his jury's finding of premeditation and deliberation.  We agree with defendants (and the Attorney General) that the court should have stayed the sentence on the conviction for active gang participation.  We reject defendants' other arguments and affirm the convictions.

## II.  FACTUAL BACKGROUND

### A.  *Prosecution Case*

#### 1.  The Attack on Sergio Cortez:  Evidence Heard by All Juries

In the evening of November 14, 2008, Scott Siewert drove the three defendants (Hayes, O'Brien, and Wisler) and two others, Darrin Thibault and Derek Richardson, to the home of Tyler Brooks.  They planned to drink beer and whiskey and smoke marijuana.

Brooks lived in a mobilehome park.  Sergio Cortez, a Hispanic man, went to the mobilehome park that night to visit with his family.  When he was near Brooks's home, someone said he tried to break into Siewert's car.  Richardson became angry and yelled and cursed at Cortez.  The two began fighting.  Siewert joined in the fight against Cortez.  Cortez fell to the ground.  Richardson and Siewert continued to kick and hit him.

Cortez got up and ran away.  Defendants and others chased after him.  Some of the attackers were shouting, "White Power" and "Coors Up."  At some point, Siewert ran back to get his car.

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

3

The group caught up to Cortez, knocked him down, and began punching and kicking his body and head. One witness to the beating recalled "the hollow noise of the head being kicked, the ribs being broken." Cortez covered his head and face with his hands to protect himself.

Hayes punched Cortez and stomped on his head by jumping up and landing on Cortez's head with both feet; O'Brien kicked and punched Cortez, and stomped on his head with one foot. Wisler kicked and punched Cortez. Even after Cortez lost consciousness and his hands fell away from his face, defendants continued to kick him. Cortez made sounds described as "gargling" or "[h]eavy snoring."

A resident of the mobilehome park called 911 and yelled out that she was calling the police.

The attackers ran to Siewert's car. O'Brien, Thibault, Wisler, and Richardson got inside the car; Siewert was driving. Someone said, "cover the plates." Hayes jumped onto the back of the car and used his body to cover the license plate. Hayes rode on the back of the car until they got outside the mobilehome park, then got inside the car.

They drove to the house of some friends, where they talked about "how cool" the attack was. Someone took a picture showing Wisler making the straight-armed Heil Hitler salute with a bloodied hand.

Police arrived at the mobilehome park about 11:25 p.m. Cortez was swollen, bleeding, and unconscious. He had difficulty breathing and was making a gurgling noise.

4

Cortez was transported to a hospital. He was in a coma; he had no eye movement, could not speak, and had only "very primitive motor reflexes involving the arms." He suffered injuries from blunt force trauma, abrasions to his extremities, and bruising to his head. Doctors inserted a breathing tube because Cortez could not breathe on his own due to neurological damage. A treating physician testified that without the breathing tube, Cortez would probably have died.

### 2. O'Brien's Statements to Police

On January 1, 2009, O'Brien was interviewed by police detectives. A recording of his interview was played to the jury deciding his case only. O'Brien told the detectives he was inside Brooks's mobilehome cooking a burrito when he noticed there was a fight going on. He saw his friends fighting and went to break it up. He did not hear anyone yell anything, and he did not hit or kick anyone. He denied being a member of the Coors gang.

### 3. Wisler's Statements to Police

Detectives interviewed Wisler on January 15, 2009. A recording of the interview was played to the jury deciding his case only. In the interview, Wisler told the detective that he, Hayes, O'Brien, Siewert, and Richardson were at Brooks's house drinking beer and hanging out. O'Brien, Richardson, and Siewert were outside the trailer. Wisler and Hayes were inside when they heard a "ruckus." Wisler went outside and saw a "Mexican dude" running. He and the others chased after him.

5

As he ran after Cortez, he and Hayes yelled, "White Power."  Wisler said he yelled "White Power" "[t]o try to seem cool in front of 'em."  He believed that Hayes yelled the phrase to scare or intimidate the "Mexican guy."

The group caught up to Cortez and started punching him and kicking him in the head.  Wisler admitted to punching Cortez twice.  Hayes and Richardson kicked him and stomped on his face.  Hayes yelled "Coors Up" as he kicked Cortez.  According to Wisler, Hayes said this to let people know "[w]here [they are] from."  After they beat Cortez, they ran to Siewert's car and drove away.

4.  <u>The Prosecution's Gang Evidence</u>

(a)  *Darrin Thibault's Testimony*

Thibault, one of the attackers, testified for the prosecution.[2]  Thibault said he was a member of Coors, a White supremacist gang.  He explained that "Coors" is an acronym for "Comrades of Our Racial Struggle."  He had been in that gang for five or six years. He left Coors in December 2008, one month after the attack on Cortez, when he agreed to cooperate with the police.

Prior to joining Coors, Thibault was a member of the Hemet Valley Skins, another White supremacist gang. Members of Hemet Valley Skins "associate with Coors," and most of them become involved in the Coors gang.  The two gangs back each other up and

---

[2]  As part of a plea bargain, Thibault pled guilty to attempted murder in this case without premeditation or a gang enhancement.  In exchange, he was required to tell the truth at the trial of his codefendants.

6

are described as having a "pretty close" relationship and a "pretty tight connection" between them.

Thibault became a member of Coors when he was in prison. In order to become a member, he was required to "prove" himself by "putting in work" for the gang. This meant he had to commit acts of violence against others for the gang. Thibault fulfilled this requirement when he participated in a prison race riot. To show he was a member of the gang, he got a Coors beer logo tattooed on his lower back.[3]

Thibault described Coors as a violent organization involved in criminal activity. The gang's main criminal activities included assaults, attempted murders, and vehicle thefts.

A Coors gang member's shoes have white laces until the member "shed[s] blood" for the gang; then he receives red laces. You can earn the red laces by "stomping."

Thibault testified that Hayes was a Coors member with a Coors tattoo on his throat. He goes by the moniker "Panic"—an acronym for "'[p]utting any nigger in check.'" In a photograph of Hayes taken in June 2008 (five months before the attack on

---

[3] In addition to his Coors beer tattoo, Thibault·had a number of tattoos indicating his affiliation with the Coors gang, including tattoos of swastikas, iron crosses, the phrases "skinhead," "All Screwed Up," "Hemet," "White Power," "oi," and the numbers "88" and "14." Thibault explained that the iron crosses represent courage and bravery, and were used because of their association with Nazi Germany. Because the eighth letter of the alphabet is "H," the number "88" refers to "HH," which is short for "Heil Hitler." The number also refers to "the 88 precepts" or "bylaws for skinheads." "Oi" refers to a skinhead greeting. "14" stands for the 14 words of a White supremacist slogan: "'We must secure the existence for our [W]hite race and our future for [W]hite children.'"

7

Cortez), Hayes is wearing white shoelaces. Four days after the attack, Hayes was photographed wearing red shoelaces.

Siewert and O'Brien were members of Hemet Valley Skins who associated with Coors. Wisler was not a member of either gang, but did associate with Coors. Wisler was aware that Thibault, Richardson, Siewert, Hayes, and O'Brien were "from Coors." Thibault identified defendants in a photograph in which each is doing the Heil Hitler salute.

Thibault explained that in the White supremacist gang culture, it was understood that if one gang member got involved in a fight, the others were expected to jump in and fight as well. Thus, once Richardson and Siewert began attacking Cortez, it was understood that the rest of them would join in.

He further testified that the point of yelling "White Power" and "Coors Up" during an attack is to let the victim and witnesses know who they are and to give a warning to others "not to fuck with [them]." He explained that if people hear the name Coors, "they would be scared" and intimidated. The notoriety increases the gang's status.

Thibault believed that when he was attacking Cortez, he was "putting in work" for Coors. However, he also testified that the attack had nothing to do with the Coors gang.

(b) *Corporal Nishida's Testimony*

Hemet Police Department Corporal Takashi Nishida testified as a gang expert. Corporal Nishida testified that the Coors gang is a White supremacist gang that began

about 15 or 20 years ago. Many members of the Hemet Valley Skins gang became Coors gang members.

The Coors gang's primary activities include murders, attempted murders, assaults with deadly weapons, vehicle thefts, drug sales, firearm violations, and burglaries. Corporal Nishida identified numerous predicate offenses committed by Coors gang members.

Corporal Nishida explained that gang members use intimidation to instill fear of them in the community. Such fear is viewed by gang members as respect for the gang. He testified that saying the gang's name while committing a crime is a way of informing others that the gang is committing the crime, and saying "[W]hite power" during the crime is a way of telling people that the gang members are part of a White supremacist gang.

"Putting in work" for a White supremacist gang refers to committing crimes for the benefit of the gang, which increases notoriety for the gang and the member who commits the crime. The more heinous the crime, the greater the notoriety.

In Corporal Nishida's opinion, Wisler, O'Brien, and Hayes were active participants in the Coors gang on November 14, 2008. In response to hypothetical questions that mirrored the facts in this case, Corporal Nishida testified that the hypothetical assault would have been in association with the Coors gang and for its benefit. Corporal Nishida explained that the assault benefits the gang by instilling fear in

9

the community, the victim, and witnesses. Through such fear the gang gains respect and notoriety.

## B. *Defense Case*

Siewert testified before all juries that on the night of the incident, he, Hayes, O'Brien, Wisler, Richardson, and Thibault were drinking alcoholic beverages for a few hours at his house. He then drove them to Brooks's house. He was outside the trailer when he saw Richardson arguing with Cortez and heard someone say something about breaking into a car. Richardson and Cortez started fighting. According to Siewert, Cortez was getting the better of Richardson. Siewert then rushed over and knocked Cortez down. Richardson told Siewert that Cortez was breaking into his car. Cortez got up and he and Siewert started fighting. Siewert knocked Cortez down again. When Cortez got up, Siewert told Cortez to "get the fuck out of here." Cortez then ran away.

Siewert then saw other people running after Cortez. He was not sure who they were because it was dark, but thought they probably came from the party at Brooks's house. Siewert followed them and, from some distance away, saw a group of people kicking and punching someone. He did not get any closer and did not get involved. Although he did not see "who did what," he knew his "friends were involved in [the] attack." Siewert ran back to his car and started to drive away. As he headed toward the mobilehome park exit, he came upon the friends he had driven to Brooks's home. They (except for Hayes) jumped inside the car; Hayes jumped on the back of the car.

10

Siewert said he did not plan to fight Cortez or encourage others to fight; he got involved in the first fight only because O'Brien was losing the fight to Cortez and he heard that Cortez was breaking into his car. He admitted being a "Hemet skin," a "proud [W]hite guy," and an admirer of Adolph Hitler, but denied being a member of the Coors gang.

Hayes testified before all juries. He admitted being a Coors member at the time of the incident. He and others had been drinking heavily by the time Siewert drove them to Brooks's house. Shortly after arriving at Brooks's house, Hayes heard a commotion outside. He heard someone yell, "he was breaking in [*sic*] the car, there's a fight." Hayes ran out of the mobilehome and saw three or four people running away from the trailer. He ran after them. As he caught up to the others, he saw Cortez get pushed to the ground. Hayes then joined in the fight by punching and kicking Cortez "[a]ll over," including his head. He punched Cortez approximately five times and kicked him approximately five times. Wisler was next to him and participating in the assault. Cortez initially used his hands to block the punches and kicks, but eventually stopped and "dropped his guard." The attackers then turned around and started running. They found Siewert as he was heading for the park exit. He jumped onto the back of Siewert's car. He covered the license plate because he "didn't want to get in trouble." Eventually, he got inside the car.

11

Hayes said that he was not thinking about the Coors gang during the assault and had no intent to promote the gang. He was thinking only that "this guy just broke into a car and I wanted to kick his ass." He intended to "beat him up," but not kill him.

Hayes introduced evidence that DNA in blood found on his shoes did not match Cortez's DNA.

### III. ANALYSIS

A. *Denial of Motion to Sever Gang Participation Count and Bifurcate Gang Enhancement Allegation*

Prior to trial, Siewert moved to sever the trial of the gang participation count from the attempted murder and assault counts and to bifurcate the trial of the gang enhancement allegation.[4] The other defendants joined in the motion. After hearing argument, the court denied the motion, explaining that "the gang evidence and the attack on the victim are intertwined with one another such that it is all part of what played out that evening." "In the opinion of the Court, to bifurcate the gang allegations and the substantive gang charge, rather than to have them heard simultaneously with the attempted murder and assault charges, would be to provide an incomplete picture of what

---

[4] Although it appears from our record that Siewert filed a written motion to bifurcate the trial of the gang enhancement allegation from the other counts, the document is not included in our record. Our record regarding the motion is limited to the discussion of the motion reflected in the reporter's transcript. At the hearing, the court construed the motion to bifurcate the gang allegation as encompassing a request to sever the gang participation count as well.

occurred that evening.  [¶]  The gang allegation and gang charge are, if believed, potentially the source of the attack and the basis for the attack being so vicious."

Defendants contend the denial of the motion to sever and bifurcate was error.  We disagree.

Section 954 permits the joinder of "'two or more different offenses of the same class of crimes or offenses.'"  The law favors joinder of counts because it promotes efficiency.  (*People v. Myles* (2012) 53 Cal.4th 1181, 1200.)  There is no dispute in this case that the gang participation count and the gang enhancement were properly joined with the attempted murder charge under section 954.

Even when joinder is proper, the trial court may, "in the interests of justice and for good cause shown," exercise its discretion to order that different offenses or counts be tried separately.  (§ 954; see *People v. Thomas* (2012) 53 Cal.4th 771, 798.)  "'"The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." [Citation.]'"  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315.)

If the court denies a motion to sever, the ruling is reviewed on appeal for abuse of discretion.  (*People v. Ramirez* (2006) 39 Cal.4th 398, 439.)  In determining whether a trial court abused its discretion, we consider the record before the trial court when it made its ruling.  (*People v. Thomas, supra,* 53 Cal.4th at p. 798.)  "We consider first whether the evidence of the two sets of offenses would have been cross-admissible if the offenses had been separately tried. [Citation.]  If the evidence would have been cross-admissible,

13

then joinder of the charges was not prejudicial." (*Ibid.*) "[C]omplete (or so-called two-way) cross-admissibility is not required. In other words, it may be sufficient, for example, if evidence underlying charge 'B' is admissible in the trial of charge 'A'—even though evidence underlying charge 'A' may not be similarly admissible in the trial of charge 'B.' [Citations.]" (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1221.)

If the evidence is not cross-admissible, "we next inquire 'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of [the] defendant's guilt of each set of offenses.' [Citations.] We consider '[1] whether some of the charges are likely to unusually inflame the jury against the defendant; [2] whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and [3] whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case.' [Citation.] 'We then balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state.' [Citation.]" (*People v. Thomas, supra,* 53 Cal.4th at pp. 798-799.)

Finally, even when a trial court's denial of severance was not an abuse of discretion at the time it was made, we must consider the evidence actually introduced at trial to determine whether the joinder resulted in a gross unfairness amounting to a denial of fair trial or due process. (*People v. Thomas, supra,* 53 Cal.4th at pp. 800-801; *People v. Myles, supra,* 53 Cal.4th at p. 1202.)

14

In addition to severing the trial of different counts under section 954, a court has discretion under section 1044[5] to bifurcate the trial of a gang enhancement allegation. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) Bifurcation of the gang enhancement may be warranted if evidence of the predicate offenses offered to establish a pattern of criminal gang activity is "unduly prejudicial" or other gang evidence is "so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (*Ibid.*)

To convict defendants of the gang participation count, the prosecution needed to prove, among other elements, that each defendant "willfully promote[d], further[ed], or assist[ed] in any felonious criminal conduct by members of [the criminal street] gang" in which he actively participates. (§ 186.22, subd. (a).) In this case, the People sought to establish this element by relying on the attempted murder and assault crimes charged in this case. Thus, if the gang participation count was severed from the other counts, the evidence regarding the attack on Cortez would need to be presented at both trials. Clearly, this would defeat the goal of promoting efficiency through joinder.

Moreover, as the trial court noted, evidence of defendants' gang participation was relevant to show motive and intent as to the attempted murder and assault counts. (See *People v. Williams* (1997) 16 Cal.4th 153, 193 [gang evidence is admissible if relevant to prove motive or intent].) The viciousness of the attack and the group participation in the

---

[5] Section 1044 allows the court "to control all proceedings during the trial . . . with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."

assault are more understandable in light of evidence of the gang's racist ideology, its culture of jumping into fights involving gang members, and that one of the gang's primary activities is murder. In the absence of such gang-related evidence, the attack might appear as an assault by drunks at a party who thought Cortez was trying to break into a car. With the evidence of the culture and criminal activities of the Coors gang, however, the same incident can be viewed as an attack on a Hispanic man by a group of White supremacists seeking to put in work for their gang and enhance the gang's reputation of violence. A motive for the viciousness of the attack and an intent to kill is more easily inferred in the latter situation. The gang evidence was thus relevant to prove such intent. Moreover, evidence regarding the nature of the Coors gang was relevant to explain the shouts of "Coors Up" and "[W]hite power" yelled during the chase of Cortez.

The gang evidence was also relevant to explain why some witnesses of the assault on Cortez had difficulty recalling the incident or contradicted prior statements to police. For example, one witness described the assault in some detail to a police investigator and identified Hayes and Wisler as two people who participated in the attack. After describing the events of that night, she told the investigator she did not want to testify in court because she was afraid of the gang and did not "want to be killed." At trial, that witness testified she could not recall the incident at all. Her fear of testifying and purported inability to remember the incident at trial could be explained by the gang expert's testimony that the gang will use fear to intimidate witnesses into recanting or

16

refusing to testify. Such evidence is thus relevant on the issue of such witnesses' credibility. (See *People v. Harris* (1985) 175 Cal.App.3d 944, 957.)

Because of the cross-admissibility of evidence of the attack in a trial of the gang participation count and of the cross-admissibility of gang evidence in a trial of the attempted murder and assault counts, the court did not abuse its discretion in denying the motion for severance.

Furthermore, reviewing the record in light of the evidence actually introduced at trial, the joinder did not deprive defendants of their constitutional rights to a fair trial or due process. To the extent the gang evidence was inflammatory, there is no reason to believe the juries did not follow the court's instructions that each count charged is a separate crime and they "must consider each count separately." Indeed, we presume they did. (See *People v. Yeoman* (2003) 31 Cal.4th 93, 139.) The admission of such evidence did not, we conclude, result in gross unfairness amounting to a denial of a fair trial or due process.

Having determined that the court did not err in refusing to sever the gang participation count from the other counts, we can easily conclude there was no abuse of discretion in denying the motion to bifurcate the trial of the gang enhancement allegation. As noted above, bifurcation may be appropriate if the evidence needed to prove the enhancement allegation would be "unduly" or "extraordinarily prejudicial" and of "little relevance" to guilt. (*People v. Hernandez, supra,* 33 Cal.4th at p. 1049.) If the gang participation count had been severed from the other counts, it would make sense to also

17

bifurcate the trial of the gang allegation from the trial of the attempted murder and assault counts. Here, however, the court denied the motion to sever the trial of the substantive counts and, as explained above, that ruling was not an abuse of discretion. Therefore, the gang evidence would be presented in the trial of the substantive crimes. Because gang evidence that was admissible to establish the enhancement allegation would have already come in to prove the substantive gang participation count, there would be no reason to bifurcate the gang enhancement allegation. Therefore, because the court did not err in denying the motion to sever the substantive counts, there was no abuse of discretion in also refusing to bifurcate the trial of the gang enhancement.

B. *Alleged Inflammatory Nature of Corporal Nishida's Testimony*

Wisler contends that Corporal Nishida's expert testimony regarding the Coors gang was so inflammatory that it deprived him of due process and his right to a fair trial. First, he points to Corporal Nishida's testimony that the primary activities of the Coors gang included murder, attempted murder, assault with a deadly weapon, vehicle theft, drug sales, firearm violations, and burglaries. Next, Wisler refers to Corporal Nishida's testimony in which the gang expert referred to the fact that Wisler had a "Nazi Pirate" tattoo and a tattoo depicting an iron cross, and that he possessed a Coors beer glass and a book about Nazi Germany. Corporal Nishida relied on these facts and Wisler's association with White supremacist gang members in opining that Wisler was an active participant in the Coors gang on the night Cortez was beaten. Finally, Wisler points to Corporal Nishida's testimony about how gang members put in work for the gang by

18

committing crimes. He concludes by asserting that "[n]one of this evidence was helpful as to the determination of guilt."

We review rulings on the admissibility of evidence, including gang evidence, under the abuse of discretion standard. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 224-225.) The defendant has the burden on appeal of establishing an abuse of discretion. (*Id.* at p. 225.) Defendants have failed to satisfy this burden.

The evidence regarding the Coors gang's criminal activities is relevant to the active gang participation count and the gang enhancement. Under section 186.22, subdivision (a) (the substantive gang participation crime), the prosecution must prove that the defendant is a "person who actively participates in any criminal street gang . . . ." Under section 186.22, subdivision (b) (the gang enhancement), the prosecution must establish that the underlying felony was "committed for the benefit of, at the direction of, or in association with any criminal street gang . . . ." A criminal street gang is defined, in part, as an "ongoing organization, association, or group of three or more persons . . . having as one of its primary activities the commission of one or more of [certain specified criminal acts]." (§ 186.22, subd. (f).) The crimes Corporal Nishida identified as the Coors gang's primary activities are among the specified criminal acts that satisfy this definition. The challenged testimony is thus directly relevant to the gang-related charges and not unduly prejudicial. (See *People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 [evidence of prior criminal acts specified in statutory definition of criminal street

19

gang is admissible to establish the primary activities of the gang].)  Its admission was not an abuse of discretion.

The evidence regarding Wisler's tattoos and his possession of a book about Nazi Germany was admissible as foundation evidence for Corporal Nishida's opinion regarding Wisler's participation in the Coors gang.  (See *People v. Gardeley* (1996) 14 Cal.4th 605, 618 [expert witness may describe the facts upon which his opinion is based so long as it is material of a type that is reasonably relied upon by experts in the field].)  Although such evidence may have been damaging to Wisler's defense, its probative value was not substantially outweighed by any undue prejudice.  (See Evid. Code, § 352; *People v. Gionis* (1995) 9 Cal.4th 1196, 1214 [prejudice in this context is not the prejudice or damage to a defense that naturally flows from probative evidence; rather, it is evidence that uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues].)  Finally, Corporal Nishida's testimony regarding the concept of putting in work for a gang was relevant to the issue of motive for the attack on Cortez and not unduly prejudicial.

Wisler's reliance on *Albarran* is misplaced.  In that case, the defendant was charged with numerous crimes, but not the substantive gang participation crime.  (*People v. Albarran, supra,* 149 Cal.App.4th at p. 219.)  A gang enhancement, however, was alleged.  (*Ibid.*)  During trial, there was extensive evidence regarding a criminal street gang whose members committed robberies, driveby shootings, carjackings, and vandalism.  (*Id.* at pp. 220-221.)  Three sheriff's deputies testified that the defendant was

a member of that gang. (*Id.* at p. 220.) A jury convicted the defendant of attempted murder, shooting at an inhabited dwelling, and attempted kidnapping for carjacking, and found the gang enhancement allegation true. (*Id.* at p. 217.) The trial court granted the defendant's motion for a new trial as to the gang enhancement because the evidence was insufficient to support the allegation. (*Id.* at pp. 222, 225.) However, it denied the motion as to the underlying counts. (*Id.* at p. 222.)

The issue on appeal in *Albarran* was whether the court erred in denying the motion for a new trial on the underlying counts in light of "extremely inflammatory gang evidence" that "had no connection to these crimes." (*People v. Albarran, supra,* 149 Cal.App.4th at p. 227.) Reviewing the matter de novo, the Court of Appeal reversed. The court explained that the "panoply of incriminating gang evidence, which might have been tangentially relevant to the gang allegations," the court explained, "had no bearing on the underlying charges." (*Ibid.*) Furthermore, some of the "gang evidence admitted was so extraordinarily prejudicial and of such little relevance that it raised the distinct potential to sway the jury to convict regardless of [the defendant's] actual guilt." (*Id.* at p. 228.)

Here, there is no challenge to the sufficiency of the evidence to support the gang participation count and the gang enhancement allegations. In contrast to the situation in *Albarran*, in which gang evidence "had no bearing on the underlying charges," the gang evidence about which Wisler complains is highly relevant to the gang charges in this case. As explained above, the evidence of the gang's primary activities was essential to

21

proving elements of the gang participation and gang enhancement allegation, evidence regarding Wisler's tattoos and book on Nazi Germany were proper to support Corporal Nishida's opinion testimony, and testimony regarding putting in work for the gang was relevant to motive. *Albarran* is thus easily distinguishable.

Because the challenged evidence was highly probative of issues in the case and not unduly prejudicial, we reject Wisler's argument that such evidence deprived him of due process or his right to a fair trial.

C. *Instructions on Aiding and Abetting and Natural and Probable Consequences Doctrine*

The court's instructions to the juries permitted the juries to convict defendants of attempted murder based on aiding and abetting and the natural and probable consequences doctrine. Under this doctrine, "a person encouraging or facilitating the commission of a crime could be held criminally liable not only for that crime, but for any other offense that was a 'natural and probable consequence' of the crime aided and abetted." (*People v. Prettyman* (1996) 14 Cal.4th 248, 260.) Thus, in this case, the juries could have convicted defendants of attempted murder if defendants intended to commit no crime greater than assault with force likely to inflict great bodily injury, that defendants aided and abetted a compatriot who attempted to kill Cortez, and the attempted murder was a natural and probable consequence of the assault.

Defendants contend this doctrine should not apply in cases such as this in which the intended (or "target") crime is assault and the charged (or "nontarget") crime is

22

attempted murder because the target and nontarget crimes have "merged." Defendants do not cite to any authority directly supporting their argument. Indeed, they acknowledge that courts have addressed and rejected the argument. (See, e.g., *People v. Karapetyan* (2006) 140 Cal.App.4th 1172, 1177-1178; *People v. Francisco* (1994) 22 Cal.App.4th 1180, 1190.) Instead, defendants contend the merger doctrine announced in *People v. Ireland* (1969) 70 Cal.2d 522 and refined in *People v. Chun* (2009) 45 Cal.4th 1172, should be extended to preclude murder or attempted murder convictions based on aiding and abetting and the natural and probable consequences doctrine. We reject the argument.

Under the common law second degree felony-murder rule, the prosecution is not required to prove the defendant's actual malice when an unlawful killing occurs in the course of the commission of a felony (other than the felonies enumerated in section 189) that is inherently dangerous to human life. (*People v. Robertson* (2004) 34 Cal.4th 156, 165, overruled on another point in *People v. Chun, supra,* 45 Cal.4th at p. 1201; *People v. Ireland, supra,* 70 Cal.2d at p. 538.) This rule was limited in *Ireland*, when our state Supreme Court held that "a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included *in fact* within the offense charged." (*People v. Ireland, supra,* at p. 539, fn. omitted.) The court explained that the use of the felony-murder rule under such circumstances "would effectively preclude the jury from considering the issue of malice aforethought in all

23

cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides." (*Ibid.*)

In *Chun*, the Supreme Court reexamined the *Ireland* merger doctrine and concluded that "[w]hen the underlying felony is assaultive in nature . . . , the felony merges with the homicide and cannot be the basis of a felony-murder instruction. An 'assaultive' felony is one that involves a threat of immediate violent injury." (*People v. Chun, supra,* 45 Cal.4th at p. 1200.) Thus, in a prosecution for second degree murder in a case in which a homicide resulted from the defendant's assaultive felony (and not a felony enumerated in section 189), the People must prove the defendant acted with malice.

Defendants argue that the merger doctrine should be extended to the aiding and abetting context such that the prosecution must prove that defendants acted with malice— that is, with the intent to kill or with conscious disregard for life. By permitting the juries to convict them based on aiding and abetting and the natural and probable consequences doctrine, they argue, the prosecution was relieved of the requirement of proving the essential element of malice and thereby deprived them of their constitutional right to due process.

A similar argument was addressed in *People v. Francisco, supra,* 22 Cal.App.4th 1180. That court rejected the argument, stating: "[A]iding and abetting is one means under which derivative liability for the commission of a criminal offense is imposed. It is not a separate criminal offense. [Citation.] As an aider and abettor, it is the intention to

further the acts of another which creates criminal liability. The "'natural and probable consequences'" [jury instruction,] which allows a finder of fact to render a verdict on derivative aider and abettor liability, presents an 'all-encompassing standard for proper lay application of law to relevant evidence on the issue of legal causation of a criminal act.' [Citation.] If the principal's criminal act which is charged to the aider and abettor is a reasonably foreseeable consequence to any criminal act of that principal, and is knowingly aided and abetted, then the aider and abettor of such criminal act is derivatively liable for the act charged. [Citation.] For this reason, the logical and legal impediments to criminal liability as found in *Ireland* are not applicable and do not have persuasive value with respect to limiting an aider and abettor's liability." (*Id.* at p. 1190.)

The *Francisco* court continued: "Appellant argues that the giving of [a natural and probable consequences instruction] means that appellant could be found guilty without a finding that he shared the perpetrator's intent to kill. As previously noted, this is not the test for aider and abettor liability. Such liability is a question of legal causation which is independent of any intent that the result in question occurred. [Citation.] Thus, the ultimate factual question is whether the perpetrator's criminal act, upon which the aider and abettor's derivative criminal liability is based, was "'reasonably foreseeable'" or the probable and natural consequence of a criminal act encouraged or facilitated by the aider and abettor. [Citation.]" (*People v. Francisco, supra,* 22 Cal.App.4th at p. 1190.)

In *Karapetyan*, the defendant was among several persons who chased after and hit or stabbed the victim, causing the victim's death. (*People v. Karapetyan, supra,* 140

25

Cal.App.4th at p. 1175.) The jury was instructed that "an aider and abettor to assault could be liable for murder if death was a natural and probable consequence of the assault." (*Id.* at pp. 1176-1177.) The defendant, like defendants in this case, argued that a finding of murder based on the instruction "is really just felony murder, which is barred by [*Ireland.*]" (*Id.* at p. 1177.) The court rejected the argument. It explained: "[T]he natural and probable consequences doctrine operates independently of the second degree felony-murder rule. [Citation.] The natural and probable consequences doctrine does not merge all assaults into the felony-murder rule. Rather, it is a theory of liability for murder that applies when the assault has the foreseeable result of death. For aider and abettor liability, it is the intention to further the acts of another that creates criminal liability and not the felony-murder rule. [Citation.] [¶] 'An aider and abettor's derivative liability for a principal's criminal act has two distinct prongs: First, the aider and abettor is liable for the particular crime that to his knowledge his confederates are contemplating. Second, the aider and abettor is also liable for the natural and probable consequences of any criminal act he knowingly and intentionally aids and abets . . . . [¶] . . . The law's policy is simply to extend criminal liability to one who knowingly and intentionally encourages, assists, or influences a criminal act of another, if the latter's crime is naturally and probably caused by (i.e., is the natural and probable consequence of) the criminal act so encouraged, assisted, or influenced.' [Citation.] Accordingly, the logical and legal impediments to felony-murder liability discussed in *Ireland* are

26

inapplicable and do not limit the liability of an aider and abettor. [Citation.]" (*Id.* at p. 1178.)

The reasons given by the *Francisco* and *Karapetyan* courts apply with equal force to defendants' argument in this case. The merger rule is a response to and limitation upon the second degree felony-murder rule. Because criminal liability based on aiding and abetting and the natural and probable consequences doctrine is independent of the second degree felony-murder rule, the merger rule has no application in the aiding and abetting context.

Defendants argue, however, that *Francisco* and *Karapetyan* must be reexamined because they were decided before *Chun*. We disagree. *Chun* clarified the felony-murder rule; it did not address aiding and abetting liability or the natural and probable consequences doctrine, and there is nothing in the opinion that casts doubt upon the analyses or holdings of *Francisco* and *Karapetyan*. The felony-murder rule and the natural and probable consequences doctrine continue to operate, as the *Karapetyan* court explained, independently of each other.

Defendants also rely on *People v. McCoy* (2001) 25 Cal.4th 1111. According to defendants' interpretation of *McCoy*, "before an aider and abettor can be convicted of murder, the prosecutor must prove he independently harbored the requisite malice and cannot rely on the mens rea of an accomplice." This is a misreading of *McCoy*. As the Supreme Court explained in that case, "an aider and abettor's liability for criminal conduct is of two kinds. First, an aider and abettor with the necessary mental state is

27

guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.] Thus, for example, *if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault.*" (*Id.* at p. 1117, italics added.) Contrary to defendants' reading of *McCoy*, it is clear that the prosecutor is *not* required to prove that an aiding and abetting defendant independently harbored the requisite malice for murder when the murder (or attempted murder) was a natural and probable consequence of the crime intended by the aider and abettor.

For all the foregoing reasons, we reject defendants' arguments regarding the jury instructions on aiding and abetting and the natural and probable consequences doctrine.

D. *Sufficiency of the Evidence to Support the Jury's Finding of Premeditation and Deliberation*

Wisler contends the evidence was insufficient to support the jury's finding that he committed attempted murder with premeditation and deliberation. We disagree.

In reviewing a challenge to the sufficiency of evidence, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could have found beyond a reasonable doubt that the attempted murder was willful, deliberate, and premeditated. (*People v. Mendoza*

28

(2011) 52 Cal.4th 1056, 1068-1069; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)  In determining whether the record contains substantial evidence of premeditation and deliberation, we draw all reasonable inferences in support of the finding.  (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.)  When the circumstances reasonably justify the jury's findings, a reviewing court's opinion that the circumstances might also be reasonably reconciled with contrary findings does not warrant reversal of the judgment.  (*People v. Mendoza, supra,* at p. 1069.)

"'[A]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'"  (*People v. Smith* (2005) 37 Cal.4th 733, 739.)  The punishment for attempted murder is increased when the murder attempted was "willful, deliberate, and premeditated."  (§ 664, subd. (a); *People v. Bright* (1996) 12 Cal.4th 652, 656-657.)  An attempted murder is "premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse."  (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)  "'"'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance.  [Citations.]"  [Citation.]  "'Premeditation and deliberation can occur in a brief interval.  "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'"'  [Citation.]"  [Citations.]'  [Citation.]"  (*People v. Mendoza, supra,* 52 Cal.4th at p. 1069.)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), the California Supreme Court identified three types or categories of evidence pertinent to the determination of premeditation and deliberation: (1) planning activity, (2) motive, and (3) manner of killing. (*People v. Perez, supra,* 2 Cal.4th at p. 1125.) The *Anderson* court observed that courts typically sustain premeditation and deliberation findings "'when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3).'" (*People v. Perez, supra,* at p. 1125, quoting *People v. Anderson, supra,* at p. 27.)

In other words, courts have generally found sufficient evidence of premeditation and deliberation when "'(1) there is evidence of planning, motive, and a method of killing that tends to establish a preconceived design; (2) extremely strong evidence of planning; or (3) evidence of motive in conjunction with either planning or a method of killing that indicates a preconceived design to kill.'" (*People v. Tafoya* (2007) 42 Cal.4th 147, 172.) However, these categories of evidence are not the exclusive means of establishing premeditation and deliberation (*ibid.*), and "need not be present in any particular combination to find substantial evidence of premeditation and deliberation." (*People v. Stitely, supra,* 35 Cal.4th at p. 543.) Other types or combinations of evidence may also support a premeditation finding. (*People v. Perez, supra,* 2 Cal.4th at p. 1125; *People v. Anderson, supra,* 70 Cal.2d at pp. 26-27.) When all three *Anderson* factors are present, however, a finding of premeditation and deliberation will generally be upheld. (*People v. Stitely, supra,* at p. 543.)

30

In his brief, Wisler points out that he was 17 years old at the time of the attack, younger than his codefendants, and had no prior criminal record. "He had grown up with a lot of people in Coors and associated with them but was not a member," and he "said 'White Power' to seem cool in front of his friends." He adds that he was drunk when he and others "rushed out and punched and stomped Cortez, who then ran towards the pool. They caught up with him and punched and stomped him on the head." Based on these facts, he argues, there was no evidence he deliberated and premeditated before following his cohorts and participating in the attack.

Wisler's analysis is focused on whether he *personally* premeditated and deliberated killing Cortez. However, the prosecution was not required to prove his *personal* premeditation and deliberation; the crime of attempted murder requires "that the murder attempted must have been willful, deliberate, and premeditated, *not* that the attempted murderer *personally* must have acted willfully and with deliberation and premeditation." (*People v. Lee* (2003) 31 Cal.4th 613, 622.) Thus, one who aids and abets another in committing attempted murder can be subject to the greater punishment for willful, deliberate, and premeditated attempted murder even though he or she did not personally act with the requisite willfulness, deliberation, and premeditation. (*Id.* at pp. 616, 627.) This is true even when liability for the attempted murder is based on the natural and probable consequences doctrine. (See *People v. Favor* (2012) 54 Cal.4th 868, 879-880; *People v. Cummins* (2005) 127 Cal.App.4th 667, 680; *People v. Curry* (2007) 158 Cal.App.4th 766, 791-792.) The question, therefore, is not whether Wisler

31

acted with willfulness, deliberation, or premeditation, but whether there is substantial evidence that the attempted murder of Cortez was "'committed by one of the perpetrators with the requisite state of mind.' [Citation.]" (*People v. Favor, supra,* at p. 879.)

There is substantial evidence that at least one perpetrator of the attack acted willfully and with deliberation and premeditation in attempting to kill Cortez. Initially, Richardson fought with Cortez, whom Richardson suspected of trying to break into Siewert's car. Siewert then joined in the fight, knocking Cortez down. When Cortez got up, Siewert told him to "get the fuck out of here." Cortez ran away. At this point during the incident, there is no substantial evidence of premeditation or deliberation regarding killing Cortez; it appears that Richardson and Siewert intended to inflict a beating on Cortez because they believed he was trying to break into Siewert's car, nothing more.

However, based on what happened next, the jury could conclude that the nature and purpose of the attack shifted from punishing Cortez for attempting to break into a car to a gang-based, racially motivated attack on Cortez's life. After Cortez fled, five or six members or associates of the Coors White supremacist gang chased after Hispanic Cortez amid shouts of "White Power" and "Coors Up." There was evidence from Thibault and Corporal Nishida regarding the use of violence as a means of putting in work for the gang, that murder and attempted murder are among the Coors gang's primary activities, and that the gang's notoriety is proportional to the heinousness of the gang's crimes. There is thus evidence of a motive for killing Cortez—to put in work for the gang and increase the gang's notoriety.

32

When the group caught up with Cortez, he was not merely punched and kicked; Hayes stomped on Cortez's head by jumping and landing on his head with both feet; O'Brien also stomped on his head. They continued to kick Cortez even after he lost consciousness. In light of the evidence regarding the Coors gang's culture of violence and the excessive brutality of the beating, jurors could conclude that one or more of the perpetrators chased after and attacked Cortez with a plan to beat him until he was dead. Although the period of time involved in the chase and the beating was brief, it was long enough to permit the reflection required for deliberation and premeditation. Accordingly, the evidence is sufficient to support Wisler's jury's finding that the attempted murder was willful, deliberate, and premeditated.

E. *Failure to Stay Sentence on Active Participation Count Under Section 654*

As to each defendant, the court imposed sentences for the convictions of attempted murder (count 1), active participation in a criminal street gang (count 2), and assault by means of force likely to cause great bodily injury (count 3). Only the sentence on count 3 was stayed pursuant to section 654. For Hayes and O'Brien, the court imposed a consecutive term of eight months, reflecting one-third of the midterm sentence of two years, for count 2. Wisler received a consecutive term of three years, reflecting one-third of the upper term, on count 2. Defendants argue their sentences for active gang participation under count 2 must be stayed pursuant to section 654. The Attorney General agrees.

Generally, under section 654, when a court imposes sentences on multiple convictions that arise out of a single act or omission, only the sentence for the longest potential term is executed; the other sentences are stayed. (§ 654; *People v. Kramer* (2002) 29 Cal.4th 720, 722; *People v. Siko* (1988) 45 Cal.3d 820, 823.) One element of the gang participation crime under section 186.22, subdivision (a) is that the defendant willfully promote, further, or assist in felonious criminal conduct by members of a gang in which the defendant actively participates. (*People v. Albillar* (2010) 51 Cal.4th 47, 56.) When the defendant is convicted of both the gang participation crime and the crime that satisfies the promote-further-assist element of the gang crime, section 654 precludes punishment for both crimes. (*People v. Mesa* (2012) 54 Cal.4th 191, 197-198; *People v. Sanchez* (2009) 179 Cal.App.4th 1297, 1315-1316 [Fourth Dist., Div. Two], disapproved on another point in *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1137, fn. 8.)

Here, defendants were convicted of assault and attempted murder, as well as active gang participation. As the Attorney General concedes, the only evidence of felonious conduct presented for the promote-further-assist element of the gang participation crime was evidence of the underlying assault and attempted murder. Defendants could, therefore, be punished only once for the multiple crimes. (See *People v. Mesa, supra,* 54 Cal.4th at pp. 197-198; *People v. Sanchez, supra,* 179 Cal.App.4th at p. 1315.) Because the conviction with the longest potential term is attempted murder under count 1, the sentence on count 2 for active gang participation must be stayed.

## IV.  DISPOSITION

The judgment is modified such that the sentence on count 2 for each defendant shall be stayed pursuant to section 654.  As modified, the judgments are affirmed.  The trial court is directed to prepare a minute order and amended abstracts of judgment reflecting the modifications.  The trial court is further directed to forward a copy of the minute order reflecting the court's modifications of the judgments and the amended abstracts of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>KING</u>
J.

We concur:

<u>McKINSTER</u>
Acting P. J.

<u>RICHLI</u>
J.

35