[No. B067172. Second Dist., Div. Three. Feb. 22, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
VICTOR FRANCISCO, Defendant and Appellant.

## COUNSEL

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Robert F. Katz and Emilio E. Varanini IV, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

HAHN, J.*—

### PROCEDURAL HISTORY

By information, appellant and codefendant Ronald Thompson[1] were charged with one count (count 1) of murder, a violation of Penal Code section 187, subdivision (a),[2] and two counts (counts 2 and 3) of attempted murder, violations of sections 664 and 187, subdivision (a). As to each count it was also alleged that a principal in the offense was armed with a firearm within the meaning of section 12022, subdivision (a)(1), and personal firearm-use allegations were made as to codefendant Thompson.

Appellant entered a plea of not guilty and denied the special allegations. Appellant's motion to sever his case from that of Thompson was granted. Trial was by jury.

Appellant was found guilty as charged in all three counts. The jury found the murder in count 1 to be of the first degree. The jury found the allegations true in counts 2 and 3 that the attempted murders were willful, deliberate, and premeditated. The jury further found the principal armed allegations to be true in all three counts.

Probation was denied. As to count 1, the base term, appellant was sentenced to the term prescribed by law of 25 years to life plus 1 year for the principal armed finding. As to counts 2 and 3, the trial court imposed concurrent sentences as prescribed by law of life with the possibility of parole. The trial court stayed imposition of the principal armed enhancements on counts 2 and 3 pursuant to section 654. Appellant was granted credit for 921 days including conduct credit.

Appellant filed a timely notice of appeal.

---

*Judge of the Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council.

[1]Thompson is not a party to this appeal.

[2]All further references to code sections will be to the Penal Code unless otherwise specified.

FACTUAL BACKGROUND

In accordance with the usual rules of appellate review (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]), the evidence established that in July of 1990, Phichai Phruksphichailert owned a restaurant. His business leased a tan Volvo which was in turn used by the accountant, Victor Francisco, Sr. Mr. Francisco, who had a son, would take the car home from work. In July of 1990, Mr. Francisco was away from the country in Belize.

On July 28, 1990, Gregory Bailey, who lived near 95th and Normandie, went to the S, M, and B Liquor store located at 95th and Normandie. It was close to 11 p.m., and Mr. Bailey was with a couple of his "home boys," Little John and Mad Dog.

While walking on Normandie from 93d, Mr. Bailey had seen the Volvo used by Victor Francisco, Sr., parked on 94th Street. There had been a lot of girls hanging around the car.

Mr. Bailey went into the liquor store for about five minutes. He and Little John then went outside the store to wait for Mad Dog. While waiting, a friend named Phil came up on his bicycle. Phil stopped about three to four feet from where Mr. Bailey and Little John were. They engaged in a conversation for about three or four minutes.

Mr. Bailey was an 8-Trey Gangster. Phil was an Original Gangster, or O.G., from the 8-Trey gang. According to Mr. Bailey, the liquor store was in 8-Trey gang territory. Hoover gang members also hung out in the area. Both the 8-Trey and Hoover gangs got along with each other.

Block Crips were enemies of the 8-Treys. They were "like Russia and the United States" used to be.

Mr. Bailey was wearing khakis, a black jacket, a hat, and Converse shoes. According to Mr. Bailey, this clothing signified the 8-Trey gang. Phil was not wearing gangster clothing. Little John was wearing 8-Trey clothing.

While Phil was talking, his back was to Normandie. A tan or beige Volvo, identified as the one used by Mr. Francisco, came from 94th, up Normandie towards the liquor store. The Volvo stopped directly in front of the store with the passenger side being closest to Mr. Bailey. Two people were in the car, with appellant being the driver.

The window was rolled down, and the passenger began to fire gunshots. The passenger was about five feet from where Phil was. About six shots

were fired from what appeared to be a revolver. Mr. Bailey began to run through the parking lot towards some trash cans. After Mr. Bailey had taken six or seven steps, the shooting stopped.

Neither Mr. Bailey nor Little John was hit. However, Phil was hit, and had fallen off his bicycle. No one in Mr. Bailey's group had had a weapon, and no one had said anything to the people in the Volvo.

Mr. Bailey saw the car drive to the first corner, and then turn right towards Western. Stephanie Gabourel and her husband had been stopped at a red light at around 95th Street, to the side of a liquor store. Ms. Gabourel had seen a Volvo come from the left side following which shots were fired from the passenger side. She saw two people fall down, following which the Volvo turned right and went down the street. She was able to write down the license number, 2LHP713.

Within four minutes of the shooting, a police car came by. Mr. Bailey talked to the officers, and gave them a description of what happened along with a description of the shooter.

Los Angeles County Sheriff's Sergeant Stanley White arrived at the crime scene at approximately 1:15 a.m. By this time the victim had been taken to the hospital. Very little evidence was at the scene.

Sergeant White was made aware of a bullet hole in a window. A bullet was recovered inside the store next to a television set. Sergeant White also received a slip of paper on which was written, " '92nd Western, 2LHP713. Volvo, silver, late model.' "

Mr. Bailey was taken to Lennox station where he spoke to Sergeant White around 3:50 a.m. Mr. Bailey described the shooting and furnished a description of the driver.

Sergeant White ran the license number of the Volvo in order to learn the name of the registered owner. He interviewed the registered owner, and learned that the person listed as having actual possession was a person of Thai descent.

Upon talking to this person, Sergeant White learned that Victor Francisco, Sr., the accountant, had subleased the car. Sergeant White was not able to contact Mr. Francisco who was in Belize.

Sergeant White drove to 109th and Western in order to look at the home where Mr. Francisco resided. While Sergeant White was at the home,

appellant drove up in the Volvo, and parallel parked in front of Sergeant White. Three other people were in the car, including Ron Thompson, a person named Campbell, and a person named Darren. All four people were detained.

Sergeant White went into Mr. Francisco's home, after receiving permission to do so. In appellant's bedroom, Sergeant White recovered a live .38-caliber lead cartridge from the top of a chest of drawers. Another live round was lying on the rug. Sergeant White found additional cartridges and cartridge casings in a shoe box which was on the floor, next to the bed.

Appellant was told he was under arrest for murder. Appellant was taken to Lennox Sheriff's station where he had a 15- to 20-minute conversation with Sergeant White. Appellant was advised of his rights, said he understood them, and said he would speak with Sergeant White. Appellant thought everything was extremely funny.

Appellant told Sergeant White he had been to a party, and then drove around. He said he had also watched television on the night of the shooting. He said he had not been anywhere near 95th and Normandie, and had no knowledge of the shooting.

On July 30, appellant telephoned Sergeant White's office, and said he wanted to talk to Sergeant White. Sergeant White went to the central jail at 11 p.m. Appellant was again advised of his rights. Appellant said he understood his rights, would waive his right to have an attorney present, and would speak with Sergeant White. Appellant told Sergeant White what had happened the night of the shooting. His demeanor was serious in this interview.

Appellant said that on the evening of the shooting, he was driving his father's car in the company of Thompson. He said they had been to a party where someone had been shot. Appellant said he was a member of the Block Crips.

Appellant said he and Thompson went to a fellow home boy named Kaboom, from whom they obtained a .38. They then drove around looking for someone to shoot. They went to an apartment house at 94th and Normandie where Thompson got out of the car. Appellant heard two or three shots, after which Thompson came back to the car, and they drove southbound on Normandie.

Appellant said that Thompson leaned out of the window, and fired two or three shots. They then returned home.

Appellant said he gave the gun to either Kaboom or another person known as Bear.

Dr. Vladimir Levicky, a deputy medical examiner for the Los Angeles County Coroner, performed an autopsy on the victim, Phillip Childs, on August 3, 1990. Dr. Levicky found a single gunshot wound to the abdominal and chest region. The entrance wound was in the right buttock area and passed through several vital, important organs. The bullet did not exit the body and was recovered.

Dr. Levicky believed the cause of death was a single gunshot wound which perforated several organs, and caused severe bleeding into the chest cavity. In lay terms, the victim bled to death.

Los Angeles County Sheriff's Deputy Edward Robinson, a firearms examiner, examined the seven live rounds of ammunition and two expended cartridge casings found in appellant's bedroom. Five of the live rounds were hollow point bullets. One round was a full metal jacket bullet.

Deputy Robinson found that three live rounds were .38-special-caliber, and four rounds were .357-Magnums. Both .357-caliber and .38-caliber rounds can be fired from a .357-caliber gun. Only .38-caliber rounds can be fired from a .38-caliber handgun.

Of the seven rounds, the full metal jacket bullet was manufactured by IVI, a foreign manufacturer. The four .357-Magnum rounds were manufactured by Winchester. The two expended cartridge casings were manufactured by Winchester. The hollow point .38 cartridges were manufactured by Remington Peters.

The bullet found on the rug in appellant's bedroom was a .38-special which was lead and had a round nose. It was manufactured by Winchester. The coroner's bullet was a .38-special-caliber, full metal case bullet. The bullet from the liquor store was a .38-special-caliber, full metal case bullet.

Deputy Robinson, in comparing the coroner's bullet and the bullet from the store, concluded that both had been fired from the same gun. He further concluded that the gun had been a revolver. These bullets would have been the same kind of live rounds as the full metal jacket live round, stamped "IVI," found in appellant's bedroom.

Los Angeles County Sheriff's investigator Herbert Giron was assigned to Operation Safe Streets Bureau, the sheriff's gang detail. Investigator Giron

had known appellant for approximately seven years. He knew appellant to belong to the Block Crips based upon appellant's own statements.

The Block Crips occupied an area surrounded by 108th Street, Western, Normandie, and Imperial Highway. A "turf" or "hood" was important to a gang member.

8-Treys were a Crips faction. They occupied territory surrounded primarily by Manchester, Vermont, Florence Avenue, and Van Ness. Their members also lived on 91st, 92d, and 93d Streets in the 1300, 1400, and 1500 blocks.

Within the area of 90th, 91st, 94th, and 95th Streets and Normandie were five factions of Hoover Crips: 9-Deuce, 9-4's, 7-4's, 9-0's, and 107 Hoover. The Hoovers and 8-Treys in the area got along relatively well.

The liquor store at 94th and Normandie was in what was primarily 9-Deuce Hoover territory, although 9-Deuce, 9-4, and 7-4 Hoovers hung out there. The 8-Treys got along with these factions very well.

Block Crips were rivals with Hoovers and did not get along with any Hoover faction. In July of 1990, in particular, in the area of the liquor store, the Block and 9-0 Hoover Crips were not getting along.

A drive-by shooting is retaliation for a perceived or alleged incident wherein one gang has been assaulted by another gang. To perform a drive-by for the hood or avenge one's gang was probably the number one enhancer of one's status or reputation. Doing hard time in prison would probably be the number two enhancer. It showed that a person was committed to the neighborhood.

ISSUES RAISED ON APPEAL

Appellant argues that he was prejudiced by the giving of a modified version of CALJIC No. 3.02. He also asserts that the evidence does not support a finding of first degree murder. Respondent argues that the credit calculations were erroneous.

DISCUSSION

1. *The giving of CALJIC No. 3.02.*

In discussing proposed jury instructions, both sides noted their agreement with respect to giving a modified version of CALJIC No. 3.01 with respect to the definition of aiding and abetting. The People also requested that

CALJIC No. 3.02 be given which explains an aider and abettor's liability for the natural and probable consequences of a crime.

The trial court at first stated that it believed the instruction was not proper under the facts of the instant case. However, the prosecution articulated its theory for the instruction, that being that if the crime contemplated was an assault with a firearm, a natural and probable consequence would be that a person would get killed.

Appellant's trial counsel agreed with the trial court that the instruction should not be given. However, the trial court indicated that the prosecuting attorney had persuaded the court that the instruction was proper under the facts, and so indicated that it would give the instruction as requested.

As part of the instructions, the jury was instructed pursuant to a modified version of CALJIC No. 3.02 as follows: "One who aids and abets is not only guilty of the particular crime aided and abetted, but is also liable for the natural and probable consequences of the commission of such crime."

■ Appellant argues it was error to give this instruction. He asserts that the jury was misled into believing that an intent to kill was not necessary for first degree murder. He argues that on the theory set forth in CALJIC No. 3.02 he could be liable for no more than second degree murder, but that as given the instruction allowed for an erroneous finding of first degree murder. Appellant also points out that such a result impermissibly relieved the prosecution from the burden of proving an essential element of the crime.

■ The law, as articulated in *People* v. *Croy* (1985) 41 Cal.3d 1 [221 Cal.Rptr. 592, 710 P.2d 392], is well settled that a defendant whose liability is predicated on his status as an aider and abettor is not required to have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. It is the intent to encourage and bring about the criminal conduct of the planned offense which the jury must find, not the specific intent that is an element of the target offense. (*People* v. *Gonzales* (1986) 192 Cal.App.3d 799, 807-808 [238 Cal.Rptr. 554].) In this regard, the Supreme Court has continued to emphasize the ongoing validity of the theory of aiding and abetting liability for any reasonably foreseeable offense committed by the person aided and abetted. (*People* v. *Cooper* (1991) 53 Cal.3d 1158, 1162, fn. 3 [282 Cal.Rptr. 450, 811 P.2d 742].)

■ Appellant argues that by allowing the theory of aiding and abetting of an assault with a firearm to be the basis for a finding of murder violates the *Ireland* principles. In *People* v. *Ireland* (1969) 70 Cal.2d 522 [75

Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323], the Supreme Court held that a felony-murder theory cannot be based on a felony which is an integral part of the homicide because such a theory would preclude the jury from considering malice aforethought in all cases wherein the homicide has been committed as a result of a felonious assault. (*Id.* at p. 539.)

■ However, aiding and abetting is one means under which derivative liability for the commission of a criminal offense is imposed. It is not a separate criminal offense. (*People* v. *Brigham* (1989) 216 Cal.App.3d 1039, 1049 [265 Cal.Rptr. 486].) As an aider and abettor, it is the intention to further the acts of another which creates criminal liability. The " 'natural and probable consequences' " standard under CALJIC No. 3.02 which allows a finder of fact to render a verdict on derivative aider and abettor liability, presents an "all-encompassing standard for proper lay application of law to relevant evidence on the issue of legal causation of a criminal act." (216 Cal.App.3d at p. 1053.) ■ If the principal's criminal act which is charged to the aider and abettor is a reasonably foreseeable consequence to any criminal act of that principal, and is knowingly aided and abetted, then the aider and abettor of such criminal act is derivatively liable for the act charged. (*Id.* at p. 1054.) For this reason, the logical and legal impediments to criminal liability as found in *Ireland* are not applicable and do not have persuasive value with respect to limiting an aider and abettor's liability. (See *People* v. *Luparello* (1986) 187 Cal.App.3d 410, 438 [231 Cal.Rptr. 832].)

Appellant argues that the giving of CALJIC No. 3.02 means that appellant could be found guilty without a finding that he shared the perpetrator's intent to kill. As previously noted, this is not the test for aider and abettor liability. Such liability is a question of legal causation which is independent of any intent that the result in question occurred. (*People* v. *Anderson* (1991) 233 Cal.App.3d 1646, 1656 [285 Cal.Rptr. 523].) Thus, the ultimate factual question is whether the perpetrator's criminal act, upon which the aider and abettor's derivative criminal liability is based, was " 'reasonably foreseeable' " or the probable and natural consequence of a criminal act encouraged or facilitated by the aider and abettor. (*People* v. *Brigham, supra*, 216 Cal.App.3d at p. 1050.)

Contrary to appellant's assertion, the jury was fully aware of the elements of the crime of first degree murder required of the perpetrator if appellant was convicted on a theory of aiding and abetting. In his reply brief, appellant argues that aiding and abetting requires a specific mens rea. However, at least one court has held that aiding and abetting does not require a specific intent or an accompanying instruction to that effect. (*People* v. *Torres* (1990) 224 Cal.App.3d 763, 768-770 [274 Cal.Rptr. 117].) In any event, as that

same case pointed out, CALJIC No. 3.01 more than adequately advises the jury about the intent required to facilitate an aiding and abetting finding, whether deemed specific or general. (224 Cal.App.3d at p. 771.) As in *Torres*, CALJIC No. 3.01 was given in the instant case.

■ In any event, even if error occurred as alleged by appellant with respect to the murder charge in count 1, the error was harmless beyond a reasonable doubt. That is, it appears beyond a reasonable doubt that the error did not contribute to the verdict. (*Yates* v. *Evatt* (1991) 500 U.S. 391, 401-402 [114 L.Ed.2d 432, 447-448, 111 S.Ct. 1884, 1892], overruled on another point in *Estelle* v. *McGuire* (1991) 502 U.S. 62 [116 L.Ed.2d 385, 398-399, 112 S.Ct. 475, 482, fn. 4].) In the instant case, in order to reach verdicts in counts 2 and 3 that appellant was guilty of attempted willful, deliberate, and premeditated murder, the jury had to find that appellant had the specific intent to kill. They were so instructed under CALJIC No. 8.67. Because the jury returned findings of true on these allegations in counts 2 and 3, it is inconceivable that the jury would not have found an intent to kill as to count 1 involving the same shooting.[3]

### 2. *Sufficiency of the evidence.*

■ Appellant argues that the evidence is insufficient to show the premeditation and deliberation necessary to establish that a first degree murder occurred. He utilizes the three factors set forth in *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], to make his argument that, at most, only second degree murder was a reasonably foreseeable consequence.

■ Of course, the test on appeal is whether a rational trier of fact could have found premeditation and deliberation beyond a reasonable doubt based upon the evidence presented. In making this determination, a reviewing court is only guided by the three factors set forth in *Anderson*, and need not find some special combination of factors or specific weight for those factors in order to make a determination of the sufficiency of evidence of premeditation and deliberation. (*People* v. *Pride* (1992) 3 Cal.4th 195, 247 [10 Cal.Rptr.2d 636, 833 P.2d 643], cert. den. (1993) __ U.S. __ [122 L.Ed.2d 709, 113 S.Ct. 1323].)

■ Applying these principles to the instant case, it is first clear that the evidence supports the jury's determination that a homicide was reasonably

---

[3]In a supplemental letter brief appellant challenges CALJIC No. 2.90 as violating his rights to due process. We reject this contention, based upon our Supreme Court's prior ruling. (*People* v. *Jennings* (1991) 53 Cal.3d 334, 385-386 [279 Cal.Rptr. 780, 807 P.2d 1009].)

foreseeable. The evidence presented by the testimony of Gregory Bailey and investigator Giron, coupled with appellant's own statement, allowed the conclusion that the instant shooting was gang oriented. The gang in which appellant was a member and the gangs who controlled that area where the liquor store was were enemies. Appellant admitted that he and his coperpetrator obtained a gun in order to shoot someone. A homicide was clearly reasonably foreseeable. (*People* v. *Flores* (1992) 7 Cal.App.4th 1350, 1361 [9 Cal.Rptr.2d 754]; *People* v. *Godinez* (1992) 2 Cal.App.4th 492, 499-500 [3 Cal.Rptr.2d 325]; *People* v. *Luparello, supra,* 187 Cal.App.3d at p. 445.)

In examining the evidence with respect to premeditation and deliberation, there is evidence of planning activity. Appellant admitted obtaining a gun in order to shoot somebody. He drove his father's car looking for someone to shoot. The gun was thereafter eliminated by giving it to someone, although appellant professed not to remember exactly who it was.

Contrary to appellant's assertion the manner of killing is also indicative of premeditation and deliberation. According to Gregory Bailey, the car was only about five feet from the victim when the shooting started. Five or six shots were fired. At such close range, and with the number of shots fired, the inference could be made that the shooter was intent on inflicting death.

Moreover, there was evidence of motive. The rival gangs involved were enemies. According to Mr. Bailey, they were enemies in the way the United States and Russia used to be enemies. In addition, Mr. Bailey and Little John were dressed in clothing identifying them as 8-Trey gang members. According to investigator Giron, drive-by retaliation shootings were a high form of honor among gangs. In this case, appellant, in his statement, referred to having been at a party where someone was shot. It was immediately after this occurrence, that appellant and his coperpetrator got the gun in order to shoot someone. Again the inference is available that the shooting was in retaliation for the shooting at the party.

It must be remembered that premeditation can occur in a short period of time. It is also to be emphasized that the test is whether any rational trier of fact, not the reviewing court, could have been persuaded by the evidence beyond a reasonable doubt. (*People* v. *Perez* (1992) 2 Cal.4th 1117, 1127 [9 Cal.Rptr.2d 577, 831 P.2d 1159].) The evidence presented in the instant case, while perhaps allowing for other possibilities, nevertheless supports a rational trier of fact's conclusion that the murder committed was premeditated and deliberate, thus constituting first degree murder.

3. *Calculation of conduct credit.*

Respondent, in its brief, argues that the conduct credit awarded appellant is erroneous by one day, and that the total credit granted appellant should be

modified to reflect 920 days instead of 921. Appellant, in his reply brief, urges that the credit total should remain at 921 days because the People did not appeal from the granting of those credits.

Initially, it appears that based upon the application of the correct formula for credit determination, that respondent is correct. (*People* v. *King* (1992) 3 Cal.App.4th 882, 886 [4 Cal.Rptr.2d 723].) While it might be preferable to bring such an error first to the attention of the trial court, because such an error appears to be in the nature of an unauthorized sentence, it may be corrected whenever it is brought to the attention of a court. (*People* v. *Walkkein* (1993) 14 Cal.App.4th 1401, 1411 [18 Cal.Rptr.2d 383].)

## DISPOSITION

The abstract of judgment is ordered amended to show 306 days of local conduct credit, and 920 days of total credit. As so modified, the judgment of conviction is affirmed.

Klein, P. J., and Hinz, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 27, 1994.