Filed 5/15/13  P. v. Saldana CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B238491 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA092407) |
| v. | |
| ENRIQUE ISMAEL SALDANA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Mike Camacho, Judge.  Affirmed.

Murray A. Rosenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Peggy Z. Huang, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Enrique Ismael Saldana (defendant) appeals from his conviction of three counts of attempted murder and three counts of assault with a firearm. He contends that the verdicts were not supported by substantial evidence. Finding no merit to defendant's contention, we affirm the judgment.

## BACKGROUND

**Procedural history**

An amended information charged defendant and Eduardo Galicia (Galicia) with the attempted willful, deliberate, and premeditated murder (Pen. Code, § 164/187, subd. (a))[1] of Daniel Gonzalez (Gonzalez) in count 1, Rafael Hernandez (Hernandez) in count 2, and Salvador Ramirez (Ramirez) in count 3. Counts 4, 5, and 6 alleged that defendant and Galicia committed an assault with a firearm upon the same three victims, in violation of section 245, subdivision (a)(2). The amended information specially alleged that a principal personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivisions (b), (c), and (e)(1); and that for purposes of section 186.22, subdivision (b)(1)(C), the crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang.

Defendant was charged in count 7 with the unlawful driving or taking of a vehicle in violation of Vehicle Code section 10851, subdivision (a); count 8 alleged a misdemeanor violation of section 12025, subdivision (a)(2), carrying a concealed firearm; and count 9 alleged that defendant carried a loaded firearm on his person in a public place in an incorporated city, in violation of section 12031, subdivision (a)(1), also a misdemeanor.

Defendant and Galicia were tried together with separate juries. After the prosecution rested its case, the trial court granted defendant's section 1118.1 motion in part[2] and dismissed the premeditation and deliberation allegation as to counts 1, 2, and 3.

---

[1]     All further statutory references are to the Penal Code, unless otherwise indicated.

[2]     Section 1118.1 provides in relevant part that "the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is

2

The jury convicted defendant of all counts as amended and found true the special allegations.

On November 29, 2011, the trial court sentenced defendant to a total prison term of 25 years. The principal term consisted of the low term of five years as to count 1, with 20 years for the personal firearm discharge by a principal. The trial court imposed an additional 10 years for the use of a firearm but stayed the enhancement under section 654. The trial court also stayed the 10-year gang enhancement, as required by section 12022.53, subdivision (e)(2). As to counts 2 and 3, the court imposed concurrent five-year low terms, plus 20 years for the firearm use, and stayed the firearm discharge and gang enhancement. The court chose the low term of two years as to each of counts 4, 5, and 6, and stayed them under section 654. The low term of 16 months for count 7, a concurrent one-year term for count 8, and a one-year term for count 9 were all imposed and stayed pursuant to section 654. Defendant was ordered to pay mandatory fines and fees, register as a gang member, and to provide a DNA sample. Defendant's total presentence custody credit consisted of 480 days.

Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**

Ramirez, Hernandez, and Gonzalez all testified at trial that on October 27, 2010, they were walking home from school near Garey and Franklin Avenues when a car circled around and stopped near them. The occupants gave them "bad looks" described as "mad-dogging" and were "throwing" gang signs. The car stopped in a restaurant driveway, blocking the sidewalk and preventing the three from continuing. Two men emerged from the back seat of the car, approached the three young men, said "This is Olive Street" or "this is Pomona Sur Olive" and gave their names as "Sicko" and "Lalo."[3]

submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

[3] As Galicia admitted to the police that he was known as Lalo as well as "Serio" we use his true name when witnesses refer to him by either of his nicknames.

Ramirez identified Galicia in a photograph and in court as the man who identified himself as Lalo and the photograph of another man as depicting Sicko. Hernandez also identified Galicia in court as one of the two men who assaulted him and his two companions.

One of the two men asked Ramirez whether he was still a "guppy" -- a disrespectful term for a member of the 12th Street gang or the tagging crew "Krazy Crowd" or "KC." Ramirez replied that he did not "bang it" anymore. One of the men then assaulted Ramirez and they fought until Gonzalez lifted his shirt, displayed his firearm, and told them to go away. Galicia and Sicko ran back to their car and obtained guns from either the trunk or the back seat. As Galicia and Sicko ran toward the car, Gonzalez saw a third man in the car displaying a gun. Ramirez testified he saw Galicia point his gun directly at Ramirez and fire. After five or more gunshots, Gonzalez used his gun to fire once into the air as he and his companions ran away from Galicia and Sicko.

Detective Greg Freeman testified as the investigating officer and a gang expert. He had been assigned to the Pomona Police Department gang unit for more than 10 years and described his training and experience investigating and interacting with Pomona gang members, particularly the "Pomona Sur Olive" or "Olive Street" gang. He testified that Olive Street had several rivals, but primarily 12th Street gang. The territory claimed by 12th Street gang included the area surrounding Garey and Franklin Avenues.

Detective Freeman testified that gang members had common symbols and signs, which he described. For example, 12th Street gang's mascot was a shark, while Olive Street gang chose the dolphin because dolphins kill sharks. Olive Street members wore hats and clothing with the letter "P" or "O" and hand signs included those letters formed with fingers. Olive Street had over 100 members, and the gang's primary activities were selling narcotics, carjacking, assault, assault with a deadly weapon, attempted murder, murder, car theft, graffiti, and witness intimidation. Certified court records showed the convictions of three Olive Street gang members, one for possession of a firearm in 2010 and two for attempted murder in 2007.

4

Detective Freeman defined the term "putting in work" as doing anything to better the gang, from writing graffiti to accompanying other members in order to assault, disrespect, or kill a rival gang member, or to act as a lookout. He added that shootings were often committed by younger members seeking to elevate their status within the gang. He explained that the more work a member put in, the greater their status and respect. Respect is important to a gang and its members; the more respect a member earned, the more power he gained within the gang.

Detective Freeman was assigned, with Detective Berger, to investigate the shooting in this case. They obtained a description and partial license plate number of the four-door Honda used by the shooters. The day after the shooting, they went to Olive Street gang territory to look for the car, saw defendant driving it, and followed him through the neighborhood. When defendant parked, the detectives stopped and asked to talk to him. After initially starting toward them, he turned and fled in the opposite direction.

The detectives gave chase. When defendant's flight was ended by a tall brick wall he was taken into custody and patted down. Detective Freeman found six .22-caliber bullets in his pocket and after some persuasion, defendant eventually admitted that during the pursuit he had thrown the gun onto a rooftop on Angela Street where Detective Freeman had lost sight of him for a moment. The gun, a fully loaded .22-caliber revolver with no safety switch, was recovered from the roof.

Detective Freeman identified a photograph of defendant's nearly heart-shaped "O" and "S" tattoos on his left ring finger, signifying that he was "married" to the gang. Detective Freeman also presented photographs of items with Olive Street gang writing which were found in the Honda, including a notebook page with "Pomona Sur Olive" and other gang graffiti written on it, a checkbook cover, and a pocket atlas with "Smiley" (defendant's gang moniker) written on it. The writings and defendant's tattoos indicated to Detective Freeman that defendant was a member of Olive Street gang.

Detective Freeman's opinion that Galicia was also a member of Olive Street gang was based upon Galicia's gang related tattoos, his admissions that he had been a member

5

of the gang for six months to a year, and that his nickname was Serio.  Galicia also told Detective Freeman that his family-given nickname was Lalo.  In a photograph depicting Sicko, Detective Freeman pointed out the Olive Street gang tattoos that suggested Galicia's membership in the gang.  Detective Freeman explained that tattoos were "badges" earned by putting in violent "work" for the gang; and that anyone else would be punished, maybe killed, for having such a tattoo.

Detective Freeman interviewed defendant after his arrest on the day following the shooting.  The interview was video recorded and played for the jury.  Defendant told Detective Freeman that Sicko and Galicia, accompanied by two young women, Vanessa and Lala, found him and suggested that they "go fishing" for 12th Street gang members.  Defendant agreed and drove to Garey Avenue where one of them recognized some "kids" and told him to pull over in front of them.

Defendant told Detective Freeman that when he stopped, Sicko and Galicia got out of the car and one of them said, "Fuck KC"; they then walked directly to the "smallest guy" of the three and "went crazy" on him.  The small guy fought back until one of the other three pulled out a gun, cocked it and said, "Get the fuck out of here."  At that moment, Galicia went back to the car to get the "strap" -- the same .22-caliber revolver found on the roof.  Galicia retrieved the gun from its usual place in the dash where the stereo used to be and then ran after the three young men, firing four or five times at them as they were running away.  The young man who had brandished his gun, then fired into the air.  Defendant claimed there had been only the one gun in the car and after the shooting, Galicia left it in the car for defendant.

Initially defendant denied having a gang nickname.  Later in the interview, he admitted that he was called "Smiley."

**Galicia's testimony**

Galicia testified that he had been a member of Olive Street gang for about six months prior to the shooting, claiming that he joined the gang for protection after he had been repeatedly assaulted by Krazy Crowd members.  Galicia identified photographs

6

demonstrating his allegiance to the gang. They depicted Galicia, Sicko, and another member "throwing up Olive Street" gang signs by forming letters with their hands.

Galicia admitted the rivalry between Olive Street gang members and "guppies," their insulting term for members of 12th Street gang and Krazy Crowd. He and other Olive Street members often went into 12th Street territory to instigate fights, or as he expressed it, "punk some guppies." Galicia explained this was meant to show their disrespect for 12th Street gang and let them know what Olive Street gang represented. When 12th Street gang members were met, Olive Street members would begin by confronting them and announcing their gang, usually saying, "This is Pomona Sur Olive." One or more of the gang members would carry a gun and would sometimes shoot rival gang members in retaliation for showing disrespect, such as by writing their graffiti in Olive Street territory. A gun was brought every time that Galicia had gone fishing for guppies with fellow gang members, and Galicia was certain that someone had "a strap" when they decided to go punk some guppies on this occasion.

Galicia claimed defendant and Sicko instigated the fight and that defendant fired the shots. Galicia testified defendant was putting in work at the time of the shooting. Galicia explained that instigating fights in rival territory and shooting rival gang members were ways that younger members put in work for the gang in order to gain respect within the gang. Galicia claimed he was inside the car at that time of the shooting, never had a weapon in his hand, and never shot at anyone. Galicia also claimed that defendant placed his gun back under the driver's seat after firing it and drove to Garfield Park where he reloaded the gun and threw away the empty shells. After walking around the park for awhile, they all spent the night in a garage on Angela Street.

## DISCUSSION

Defendant contends that his convictions for attempted murder and assault with a firearm were not supported by substantial evidence.

When a criminal conviction is challenged as lacking evidentiary support, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is

7

reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) We must presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.]" (*Ibid*.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Instead of summarizing the evidence in the light most favorable to the verdicts, defendant has reduced it to "its bare bones"; he contends that the evidence showed that, at most, he aided and abetted a simple assault upon Ramirez, and that his only involvement was driving and attempting to stop the fight. It is defendant's position that we must disregard Galicia's self-serving testimony, as it conflicts with the testimony of two of the victims who identified Galicia as the shooter and defendant as a nonparticipant in the shootings. Further, defendant contends that we must give weight to his own statement that he was unwilling to go "fishing" with the others, and to the absence of an express mention of his knowledge they intended to use a gun.

Defendant forgets that a third victim, Gonzalez, testified that the man who remained in the car displayed a firearm while the other two shooters ran to the car to get their weapons. The evidence thus supported a finding that all three men had firearms. Moreover, our review is not limited to "'isolated bits of evidence.'" (*People v. Johnson*, *supra*, 26 Cal.3d at p. 577.) We do not reweigh the evidence or resolve conflicts in the evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "'[W]e must presume in support of the judgment the existence of every fact that the trier of fact could reasonably have deduced from the evidence. [Citation.] Thus, if the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not

8

warrant reversal of the judgment.  [Citation.]'  [Citation.]"  (*In re V.V.* (2011) 51 Cal.4th 1020, 1026.)

It was for the jury to believe or disbelieve some or all of Galicia's testimony and defendant's statement to Detective Freeman.  (See *People v. Williams* (1992) 4 Cal.4th 354, 364.)  Further, the jury was entitled to reject some portions of the testimony and statement while accepting others.  (*People v. Allen* (1985) 165 Cal.App.3d 616, 623.)  "Weaknesses and inconsistencies in eyewitness testimony are matters solely for the jury to evaluate."  (*Ibid.*)  "On appeal that portion which supports the judgment must be accepted, not that portion which would defeat, or tend to defeat, the judgment.  [Citations.]"  (*People v. Thomas* (1951) 103 Cal.App.2d 669, 672.)  Nor may we discard evidence that defendant finds self-serving or weak; on the contrary, we must discard the evidence that was unfavorable to the prevailing party.  (*In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497.)

Here, the prosecution theory was that defendant was an aider and abettor and the trial court thus instructed the jury as to the general principles of aiding and abetting, as well as the natural and probable consequences doctrine.  "[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and [with] (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime."  (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)  "'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime.  The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable.  [Citation.]'  [Citation.]"  (*People v. Medina* (2009) 46 Cal.4th 913, 920 (*Medina*).)

Factors that suggest aiding and abetting include presence at the scene, companionship, conduct before and after the crime, and flight.  (*Medina*, *supra*, 46

9

Cal.4th at p. 920.) Defendant's statement and the testimony of the victims, Detective Freeman, and Galicia provided ample evidence of all the factors: defendant agreed to drive his companions to the territory claimed by rival 12th Street gang for the purpose of searching out 12th Street or Krazy Crowd members and instigating a fight; defendant drove to the area and blocked the path of the victims at the request of one of his companions; defendant watched the fight and was close enough to hear what was said; when Galicia and Sicko ran back to the car for guns, defendant remained in the car displaying a gun; defendant remained with his companions all night afterward; the next day defendant was arrested after detectives saw him driving the car used in the incident; and the gun used in the shooting was recovered from the rooftop where defendant threw it while fleeing the detectives.

The same evidence supports defendant's conviction under the natural and probable consequences doctrine. "Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' [Citation.]" (*Medina, supra*, 46 Cal.4th at p. 920.) "A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury. [Citations.]" (*Ibid*.) "When rival gangs clash today, verbal taunting can quickly give way to physical violence and gunfire. No one immersed in the gang culture is unaware of these realities, and we see no reason the courts should turn a blind eye to them." (*People v. Montes* (1999) 74 Cal.App.4th 1050, 1056.) "Given the great potential for escalating violence during gang confrontations," it is reasonably foreseeable that one gang member would fire a weapon at a rival gang member under such circumstances. (*Ibid*.)

Thus, in the context of a gang shooting, firing a gun may be a reasonably foreseeable consequence of the gang's assault on rival gang members where there is evidence of ongoing rivalry involving past acts of violence, even where an actor does not know whether his fellow gang members are armed on the particular occasion. (*Medina, supra*, 46 Cal.4th at pp. 920-921, 924; and see cases cited at pp. 920-921.) Nevertheless,

10

substantial evidence supported a reasonable inference that defendant did in fact know that his fellow gang members were armed and that defendant was armed as well: defendant admitted he was driving the car in which a special compartment had been fashioned in the dashboard to hold a gun; there may have been as many as three guns in the car as Gonzalez saw the man who stayed in the car displaying a firearm while the other Olive Street gang members retrieved theirs from the car; and Galicia testified that gang members usually carried guns when going into enemy territory to instigate fights.

The elements of attempted murder are "the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citations.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623.) When a gang member fires multiple shots at close range at a group of people in rival gang territory, it is reasonable to infer a specific intent to kill. (See *People v. Rand* (1995) 37 Cal.App.4th 999, 1001-1002; *People v. Francisco* (1994) 22 Cal.App.4th 1180, 1192.) Here, substantial evidence supported a finding that while in a rival gang's territory, defendant's fellow gang member Sicko or Galicia or both, fired at the victims and thus committed both elements of attempted murder.

Substantial evidence also established defendant's liability as an aider and abettor, either directly or under the natural and probable consequences doctrine. Defendant encouraged and facilitated the shooting by driving to the location, blocking the victims' path, and displaying a weapon while his companions retrieved theirs, suggesting he knew they intended to fire on the victims. It was also reasonably foreseeable that defendant's companions would attempt to kill rival gang members after instigating a fight with them in their territory, particularly since guns were within reach. We conclude that defendant was properly convicted as a direct aider and abettor (see *People v. Beeman*, *supra*, 35 Cal.3d at p. 561) or under the natural and probable consequences doctrine. (See *Medina*, *supra*, 46 Cal.4th at p. 920.)

11

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ


We concur:



_____, Acting P. J.
ASHMANN-GERST



_____, J.*
FERNS

_____

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

12