Filed 5/15/15  In re Martinez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re HECTOR MARTINEZ<br><br>on<br><br>Habeas Corpus. | D066705<br><br>(San Diego County<br>Super. Ct. No. SCD224457) |

THE COURT:

Petition for habeas corpus.  Petition denied.

Marilee Marshall & Associates and Marilee Marshall for Petitioner.

Kamala D. Harris, Attorney General, William M. Wood, Deputy Attorney General, for Respondent.

This case is before us a second time.  In the prior case (*People v. Martinez et al.* (March 5, 2013, D058929) [nonpub. opn.] (*Martinez I*)), Hector Martinez and his codefendant appealed, contending among other things that their first degree murder convictions should be reversed because the trial court erred by failing to adequately instruct the jury on the natural and probable consequences doctrine of liability for aiders and abettors.  Specifically, they argued the instruction "failed to correctly inform the jury

that [they were] guilty of premeditated murder only if the jury found that premeditated murder, and not merely murder, was the natural and probable consequence of the target crimes." We rejected that argument based on *People v. Favor* (2012) 54 Cal.4th 868, 876-880. Martinez appealed to the California Supreme Court, which denied his petition for review without prejudice to any relief he might obtain under *People v. Chiu* (2014) 59 Cal.4th 155, 166 (*Chiu*), which holds that the natural and probable consequences rule cannot be a basis for convicting a defendant of first degree murder.

Martinez filed this writ petition, arguing he is entitled to have his sentence reduced to second degree murder under *Chiu, supra,* 59 Cal.4th 155.[1] The People acknowledge that we have jurisdiction to resolve this writ petition under *Application of Hillery* (1962) 202 Cal.App.2d 293, 294, but they argue we should remand the matter for the trial court to resolve it in the first instance. We elect to exercise our jurisdiction to resolve the writ petition. Because sufficient evidence supported Martinez's first degree murder conviction under a direct aiding and abetting theory, we deny the petition.

FACTUAL AND PROCEDURAL BACKGROUND

We take judicial notice of our decision in *Martinez I*, which affirmed Martinez's conviction for the first degree murder of Guillermo Esparza (Pen. Code,[2] § 187, subd.

---

[1] The parties do not dispute that *Chiu* is retroactive and applies to this case. The decision changed the law by disapproving the use of the natural and probable consequences theory as a basis to elevate murder to first rather than second degree. (See *In re Johnson* (1970) 3 Cal.3d 404, 410-411 [retroactivity of decisions announcing a new rule of law].)

[2] All statutory references are to the Penal Code.

2

(a)); assault of Esparza with a semi-automatic firearm (§ 245, subd. (b)(1)) and assault with force likely to cause great bodily injury to Jimmy Parker (§ 245, subd. (a)(1)). The jury found true allegations that each crime was committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)); Martinez was vicariously armed with a firearm in the commission of the murder (§ 12022, subd. (a)(1)); the codefendants were principals in the commission of the murder; and a principal used a firearm and proximately caused great bodily injury and death (§ 12022.53, subds. (d), (e)(1)). The trial court sentenced Martinez to a determinate term of six years plus an indeterminate term of 50 years to life.[3]

---

[3] In the trial court, Martinez moved for a modification of his sentence under section 1181, subdivision (6), arguing the evidence was insufficient to show he committed murder; rather, at the most, it showed he had assaulted Parker. The People opposed Martinez's motion, arguing sufficient evidence existed to sustain the first degree murder conviction: "This murder was a cold[-]blooded, gang[-]motivated crime in which the defendants seized the opportunity to represent themselves and their gang by committing [a] violent crime that enhanced their and their gang's reputation. Under a simple aiding and abetting theory, the People demonstrated that 1) [the codefendant] committed murder, 2) [Martinez] knew [the codefendant] intended to commit murder, 3) before or during the commission of the murder, [Martinez] intended to aid and abet [the codefendant] in committing the murder, and 4) [Martinez's] words or actions did in fact aid and abet [the codefendant's] commission of the murder. Indeed, the People argued [at trial] that [the codefendant] and [Martinez] formed a murder team—each with a specific role to play. Each defendant shared a gang, shared a motive to kill to enhance the gang's reputation, shared common experience as gang members, worked in tandem to kill and ran away from the scene together." The trial court agreed with the People: "Having heard and considered the motion, and bearing in mind I presided over the jury trial in this case, the motion is denied. And in denying the motion, I have weighed the merits of the motion and I incorporate the People's response specifically as to the following: First of all, the court is guided by a presumption in favor of the correctness of the verdict. [¶] Second of all, there is sufficient credible evidence to sustain the verdict of first degree murder, and the jury properly received and considered the evidence in this case. I find no

3

We summarize the facts set forth in *Martinez I*, supplementing it with expert testimony from San Diego Police Department Detective Nestor Hernandez:  Late in the evening on August 20, 2009, the codefendant's girlfriend was with the codefendant and Martinez when she saw the codefendant with a gun.  She objected to his having a gun at her house, and asked him to take the gun away.  The codefendant, accompanied by Martinez, left the house.  But the codefendant had not disposed of the gun.  A few hours later, Martinez, the codefendant and his girlfriend were in her vehicle at a drive-thru restaurant.  She noticed a gun in the codefendant's lap.  When she was driving home, the codefendant suddenly told her to stop the vehicle.  Martinez and the codefendant left the vehicle and ran up to Jimmy Parker and Guillermo Esparza, who were walking down the street.  Martinez asked Parker, "Where are you from?"  Parker mentioned the name of a group that was not a gang, but rather engaged in tagging.  Martinez punched Parker and they fought.  Parker heard the codefendant say, "This is Lomas," and the codefendant shot Esparza, who died as a result.  Martinez hit Parker once more after the gunshot was fired.  Immediately afterwards, Martinez and the codefendant ran from the crime scene.

Detective Hernandez testified that Martinez and his codefendant were documented Lomas gang members.  According to the detective, gang members commonly carried weapons when preparing to assault someone or enter rival gang territory, and by being armed they showed their fellow gang members their willingness to commit violence to defend themselves or the gang.  Detective Hernandez stated that when gang members

basis in law or fact where I could exercise my discretion and either reduce the verdict or set aside the verdict."

4

approached someone and asked, "where are you from," that aggressive question set up a challenge that usually ended with the questioner attacking the other person. Detective Hernandez stated gang members were expected to support one another: "If you are a companion or your gang associate or your gang member friend hit someone up and asks where they are from, or is challenged or do the challenging, they have to back up their gang associate or gang member friend, irregardless, for not only representation for themselves . . . but the gang itself, and if they don't, then there is severe retaliation or severe repercussions on that person who doesn't participate."

The prosecutor asked Detective Hernandez: "If . . . a Lomas gang member were to issue a gang challenge and engage in an assault with other Lomas gang members and some of those others had any kind of weapon, would there be an expectation for the person who has the weapon to use it in the confrontation?" Detective Hernandez replied in the affirmative. The prosecutor posed a hypothetical based on the facts of this case, asking what would happen if two Lomas gang members approached perceived rivals, issued a gang challenge, received the reply that the perceived rival belonged to a tagging group, and the Lomas members simply walked away. Detective Hernandez responded that those individual gang members—and by extension the Lomas gang itself—would be perceived as weak in the eyes of the tagging group and rival gangs.

Detective Hernandez testified gang members value "respect," which they purport to gain by "committing more acts of violence, more crimes, being involved with more confrontations with other gang members, expressing that or relaying that to the other active gang members themselves, not only that you are trying to up the status—your own

5

status within the gang, but also up the status of the specific gang as to how it reflects on rival gang members."

The court instructed the jury with CALCRIM Nos. 400 and 401 regarding aiding and abetting, and with CALCRIM No. 403 regarding the natural and probable cause doctrine.[4]

## DISCUSSION

"Both aiders and abettors and direct perpetrators are principals in the commission of a crime." (*People v. Calhoun* (2007) 40 Cal.4th 398, 402; § 31.) "[A]iding and abetting is one means under which derivative liability for the commission of a criminal offense is imposed. It is not a separate criminal offense." (*People v. Francisco* (1994) 22 Cal.App.4th 1180, 1190.) "There are two distinct forms of culpability for aiders and abettors. 'First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted." ' " (*Chiu, supra,* 59 Cal.4th at p. 158.)

---

[4] During deliberations, the jury sent the court a note stating: "Clarification Request on description of [CALCRIM No.] 401[,] Aiding and Abetting: Point # 2 says: 'The defendant knew that the perpetrator intended to commit the crime[.]' What is meant by 'the crime?' Did aider and abettor have to know or even expect the possibility that it will be murder ([as charged in] count #1)? Or does it mean any crime?" The court replied that " 'the crime' refers to any crime the defendant(s) are on trial for." Regarding aiding and abetting, the court replied, "This is what the jury has to decide. Refer to [CALCRIM Nos.] 400, 401 and 403, read together." The court added, " '[A]ny crime' means any crime the defendants are on trial for."

6

*Chiu* holds : "[P]unishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine. . . . [W]here the direct perpetrator is guilty of first degree premeditated murder, the legitimate public policy considerations of deterrence and culpability would not be served by allowing a defendant to be convicted of that greater offense under the natural and probable consequences doctrine." (*Chiu, supra,* 59 Cal.4th at p. 166.)

*Chiu* explains: "First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death." (*Chiu, supra,* 59 Cal.4th at p. 166.)

"When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground." (*Chiu, supra,* 59 Cal.4th at p. 167.) Thus, a defendant's "first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder." (*Ibid*.) Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and

7

with the intent or purpose of committing, encouraging, or facilitating its commission. (*Id.* at p. 167.)

As noted, the jury here was instructed regarding aiding and abetting principles. Applying those principles, we conclude sufficient evidence supports Martinez's first degree murder conviction. We reiterate what we stated in *Martinez I*: "Here, [Martinez] was the aider and abettor, but he initiated the attack by asking which gang the victims belonged to, and swung and hit Parker. Even after approximately four minutes of fighting, [Martinez] did not manage to overcome Parker's resistance. Afterwards, [the codefendant] fired one shot. [Martinez], undeterred by the gunshot, subsequently took another swing at Parker. It was not until [the codefendant] fired two more shots that [Martinez and the codefendant] ran away. This evidence offers no indication that the murder was anything other than willful, deliberate and premeditated."

*Chiu, supra,* 59 Cal.4th 155, does not alter that conclusion, particularly as we bolster our analysis with expert testimony relating to the jury's true finding that Martinez committed the murder for the benefit of, at the direction of, and in association with a criminal street gang. The jury reasonably could conclude Martinez was aware the codefendant carried a gun in the vehicle because he was aware the codefendant had it earlier, and after the girlfriend had told the codefendant to remove it from her house, Martinez accompanied the codefendant who had promised to dispose of it. Further, the gang expert's testimony provided the jury with a basis to find that Martinez likely was emboldened to challenge Parker and Esparza—by asking them where they were from— precisely because Martinez knew the codefendant was carrying a gun and Martinez relied

8

on his codefendant's support as he attacked the others. Further, Martinez's use of violence would enhance the respect he received within the gang and for the gang among rival gangs. Lastly, Martinez encouraged and facilitated the first degree murder by attacking Parker, thus simultaneously preventing Parker from defending Esparza, and freeing up the codefendant to focus exclusively on Esparza, which the codefendant did by shooting and killing him. Accordingly, we conclude that on this record, any instructional error concerning the natural and probable consequences doctrine was harmless even under the higher standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 22-24.

DISPOSITION

The writ petition is denied.

O'ROURKE, J.

WE CONCUR:

NARES, Acting P. J.

McINTYRE, J.