Filed 3/17/16  P. v. Legaspi CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068710 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB1200952) |
| ANTHONY JOHN LEGASPI et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of San Bernardino County, Annemarie G. Pace, Judge.  Affirmed in part, reversed in part and remanded with directions.

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant, Jose Ramon Lara.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant, John David Salazar.

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant, Anthony John Legaspi.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lynne G. McGinnis and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants, Anthony John Legaspi, John David Salazar, and Jose Ramon Lara, belonged to the same Hispanic criminal street gang. After an incident earlier in the day in which Legaspi felt humiliated, he shot at a group of five African-American males, killing two of them and wounding two others. Salazar drove Legaspi to and from the scene, and Lara provided Legaspi with the murder weapon and assisted in disposing of it.

All defendants were charged with two counts of first degree murder (Pen. Code, § 187, subd. (a);[1] counts 1 and 2), three counts of attempted first degree murder (§§ 664, 187, subd. (a); counts 3, 4 and 5), and street terrorism (§ 186.22, subd. (a); count 7); and Lara was also charged with being an accessory after the fact (§ 32; count 6). Legaspi was prosecuted as the lone shooter, and Salazar and Lara were prosecuted as direct aiders and abettors of the shootings, and as aiders and abettors of the target offense of "assault, challenging someone to fight, fighting, or offensive words," under the natural and probable consequences doctrine.

The jury convicted defendants on all counts. The jury found true allegations that in the commission of all the offenses a principal personally used a firearm; personally and

---

[1]      Undesignated statutory references are to the Penal Code.

2

intentionally discharged a firearm; and personally and intentionally discharged a firearm, proximately causing great bodily injury or death (§ 12022.53, subds. (b), (c) and (d)). On counts 1 through 6, the jury found true allegations that defendants committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C).

The court sentenced Legaspi to an indeterminate prison term of 220 years to life. Salazar and Lara each admitted to one prior conviction within the meaning of section 667.5, subdivision (b), and the court sentenced them to indeterminate prison terms of 197 years to life.

On appeal, Legaspi contends he is entitled to a new sentencing hearing. He asserts that since he was a juvenile when he committed the offenses, his de facto sentence of life without parole is cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

Lara contends his convictions for first degree murder must be reversed because after trial, the California Supreme Court held in *People v. Chiu* (2014) 59 Cal.4th 155, 158-159 (*Chiu*), that as a matter of law there is no aider and abettor culpability for first degree premeditated murder under the natural and probable consequences doctrine. He also challenges two aspects of his sentence. Salazar joins in Lara's arguments. Legaspi joins in one of the sentencing issues.

We agree that Lara's and Salazar's convictions for first degree premeditated murder must be reversed. On remand, we direct the court to give the People the option of accepting a reduction of the murder convictions to second degree murder or retrying them

3

on the greater offense.  (*Chiu*, *supra*, 49 Cal.4th at p. 168.)  Further, we agree that the court erred by sentencing Lara and Salazar to sentences of seven years to life on their attempted murder convictions, and their abstracts of judgments must be amended to show sentences of life with the possibility of parole.  In all other respects we affirm the judgments.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendants were active members of Varrio Redlands, an Hispanic criminal street gang in the City of Redlands area.  Adrian Powers was associated with Varrio Redlands members.[2]

On January 5, 2011, Powers attended a barbecue with Legaspi and Salazar at the home of another Varrio Redlands member.  Powers overheard Legaspi say he had been in an altercation with a group of 10 to 15 African-American males earlier that day when he was on a drug delivery.  Legaspi said the males were "saying bad stuff," and "they attacked him."  One of the males reached into a backpack and said, "You don't want any of this."  Legaspi ran away because he believed the male had a gun.

A barbecue attendee taunted Legaspi about the incident.  He said:  "Why did you allow that to happen?  Back in my day, I would not allow that.  If it was me, I would have went there and talked to them and already handled the issue."  This embarrassed Legaspi.  He "kept getting madder and red in the face."

---

[2]     Powers entered into an agreement to plead guilty to voluntary manslaughter and a gang enhancement, with a potential prison term of between three and 21 years, in exchange for his testimony.  He testified while under protective custody because of defendants' threats against him.

4

Legaspi, Salazar, and Powers left the barbecue and walked to Lara's nearby home. Legaspi and Salazar were saying "let's go get it, let's go get it." Lara was a "mid-level manager of Varrio Redlands," and "some of the less influential members check in with him, keep him posted." Lara "would make decisions within the gang and . . . would send out lower[]level gang members to do Varrio Redlands business."

After a few minutes, Legaspi and Salazar left Lara's home. While they were gone, Lara laughed about the "situation" and said it was Legaspi's "own fault he got jumped . . . walking over there by himself." Legaspi and Salazar returned, and Lara told Powers to step outside.

Powers went outside and "smoked some weed." He peered into the house through an open door and saw Lara holding a black object wrapped in a blue bandanna. The object had a handle with a red dot on it. A few months earlier Lara showed Powers a nine-millimeter semiautomatic handgun that was wrapped in a blue bandanna. The gun's handle had a red dot on it. Defendants noticed Powers looking in and closed the door.

When Powers was allowed back inside, part of the blue bandanna was sticking out of Legaspi's jacket pocket. Salazar said, "[L]et's go, we are going to see where [Legaspi] got jumped." Legaspi, Salazar, and Powers left in Salazar's car and drove around. Near the playground area of an apartment complex Legaspi noticed a group of African-American males, one of whom was carrying a backpack. Legaspi said, "That's them, [t]hat's the guys who jumped me." Salazar stopped the car and said, "All right, let's get them," and, "Go." Salazar waited in the car "[b]ecause he's the only one who knew how to drive."

5

Legaspi pulled the hood of his sweatshirt over his head and began running toward the African-American males.  Powers followed him, lagging behind.  Powers saw Legaspi turn a corner, and then he heard numerous gunshots.  Powers ran back to Salazar's car and said, "Let's go," but Salazar refused to leave without Legaspi.  Legaspi got to the car and they sped away.  They eventually returned to Lara's home, where Legaspi and Salazar discussed whether they had "fucked up."

Michael Bouldin was parked in the area of the shootings.  He saw two Hispanic males, one of whom held a gun and cocked it, running after a group of African-American males, several of whom he recognized as his son's friends.  He heard gunshots and saw the Hispanic males run back to a car and flee.  He identified Legaspi as the person with the gun.[3]

Jordan Howard, Tequan Thomas, Andrew Jackson, Quinn McCaleb, and Antonio Puente were together in the playground area.  Puente testified they were confronted by a male who was carrying a handgun and "shouted . . . where he was from."  The male took "two deliberate shots and then he shot randomly."  Howard, Thomas, Jackson, and McCaleb were all shot, and Jackson and McCaleb were mortally wounded.  Puente ran away and was not hit.  He identified Legaspi as the shooter.

---

[3]    Bouldin was a reluctant witness.  After he witnessed the incident he and his family moved from the neighborhood.  He cried during his testimony because he feared for his and his family's safety.

6

Eight 9-millimeter bullet casings were found at the scene, and it was determined they were fired from the same gun. Two bullets collected from one of the victims and his clothing were consistent with the casings.

Legaspi admitted to cellmate Davante McConnell that he shot two African-American males in the playground of an apartment complex.[4] Legaspi told McConnell "he went by these bushes to hide and wait for the victims to come out," and before the shootings he "yelled out Varrio Redlands gang." He also told McConnell he used a nine-millimeter gun, and after the shootings "[h]e went somewhere in the middle of the desert where the big fans were to bury it."

Cell phone records showed that Salazar's phone was near the area of the shootings when they occurred. The records also showed multiple calls were made between Salazar's and Lara's phones shortly before and after the shootings.

Lara admitted to a detective that he assisted in burying the murder weapon, a black semiautomatic handgun, in the desert.[5] Lara showed the detective and other officers where he thought it was buried, but it was not found. He denied it was his gun or that he gave a gun to Legaspi.

The gang expert, Chad Mayfield, is a police officer with the City of Redlands. In his opinion, when a Varrio Redlands member brings a problem to the attention of a

---

[4] McConnell came forward because Howard was a friend. McConnell received no consideration for his testimony, and he said he feared for his and his family's safety because of "my race" and Legaspi's gang affiliation.

[5] This evidence was admitted only in the case against Lara.

fellow gang member, a response is required, both for racial reasons and to avoid losing respect. Officer Mayfield explained, "If you don't act, then you're going to lose your position of authority within the neighborhood." He also testified that the shootings in this case would benefit Varrio Redlands because they "would show [African-American males] that if they even attempt to threaten or jump a member of Varrio Redlands, . . . they would be dealt with." Even if Legaspi "shot the wrong people," defendants' status in the gang would improve and they would be "entrusted with other such tasks or jobs within the gang."[6]

DISCUSSION

I

*First Degree Premeditated Murder/Chiu Opinion*

Lara, joined by Salazar, contends the court prejudicially erred by instructing the jury it could find him guilty of first degree premeditated murder under the natural and probable consequences doctrine. He asserts the People "cannot establish that [he] was convicted of first degree murder under another legally valid theory."

"Both aiders and abettors and direct perpetrators are principals in the commission of a crime." (*People v. Calhoun* (2007) 40 Cal.4th 398, 402; § 31.) "[A]iding and abetting is one means under which derivative liability for the commission of a criminal offense is imposed. It is not a separate criminal offense." (*People v. Francisco* (1994)

---

6    The three victims who survived the attack, Puente, Thomas, and Howard, all denied any gang affiliation, gun possession, or involvement in any altercation with Legaspi earlier in the day.

8

22 Cal.App.4th 1180, 1190.) "Factors relevant to a determination of whether [a] defendant was guilty of aiding and abetting: presence at the scene of the crime, companionship, and conduct before and after the offense. (*People v. Singleton* (1987) 196 Cal.App.3d 488, 492.)

"There are two distinct forms of culpability for aiders and abettors. 'First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted." ' " (*Chiu*, *supra*, 59 Cal.4th at p. 158.)

*Chiu*, *supra*, 59 Cal.4th 155, holds that an aider and abettor may be convicted of second degree murder, but not first degree premeditated murder, under the natural and probable consequences doctrine. (*Id.*, at pp. 158, 166.) "[P]unishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine . . . . [W]here the direct perpetrator is guilty of first degree premeditated murder, the legitimate public policy considerations of deterrence and culpability would not be served by allowing a defendant to be convicted of that greater offense under the natural and probable consequences doctrine." (*Id.* at p. 166.)

The opinion explains: "First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation, which trigger a heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires

9

more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death." (*Chiu*, *supra*, 59 Cal.4th at p. 166.)

An aider and abettor may still be convicted of first degree premeditated murder based on direct aiding and abetting principles. (*Chiu*, *supra*, 59 Cal.4th at p. 166.) "Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Id.* at p. 167.)[7]

"When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground." (*Chiu*, *supra*, 59 Cal.4th at p. 167, italics added.) A defendant's "first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder." (*Ibid.*) When reversal is required, the People have the option of accepting a reduction of the first degree murder convictions to second degree murder or retrying them on the greater offense on a direct aiding and abetting theory. (*Chiu*, at p. 168.)

---

7    A defendant may be found guilty of *attempted* premeditated murder as an aider and abettor under the natural and probable consequences doctrine. (*People v. Favor* (2012) 54 Cal.4th 868, 872; *Chiu*, *supra*, 59 Cal.4th at pp. 162-163.) The "premeditation finding—based on the direct perpetrator's mens rea—is determined after the jury decides that the nontarget offense of attempted murder was foreseeable." (*Chiu*, at p. 162.)

10

The court instructed the jury that Lara and Salazar could be found guilty as direct aiders and abettors or as aiders and abettors under the natural and probable consequences doctrine. The People concede instructional error, but they assert reversal is unwarranted because the record shows beyond a reasonable doubt that the jury convicted Lara and Salazar as *direct* aiders and abettors of the murders. The People rely on the strength of the evidence to support a finding based on a theory of direct aiding and abetting, such as Lara's supplying the gun to Legaspi, and Salazar's provision of transportation to and from the scene.

The issue, however, is not whether substantial evidence supports the first degree murder convictions on a theory of direct aiding and abetting. The issue is whether the record shows beyond a reasonable doubt that the jury relied on a valid theory, and the record here falls short. The People acknowledge there was also evidence to support a conviction under the natural and probable consequences doctrine. Powers testified that when he and defendants left Lara's home he did not believe anyone would be shot, and if that had been the plan he would not have participated. Powers believed that "at most" the plan was to "scare somebody," presumably with the gun. He stated the intent was "[t]o fight them, talk crap to them, let them know that they jumped the wrong person."

The People assert we should ignore Powers's testimony because he had stepped outside when Lara gave Legaspi the gun, and thus he was unaware of defendants' exact plan. In closing, however, the prosecutor argued "Powers is the best source you have for what happened in this case." The prosecutor pointed out that "Powers thought they were just going looking for some people, or he thought at most that they were going to maybe

11

fight them, fistfight."  The prosecutor argued it was nonsensical for Legaspi and Powers to try to fight a larger group, "[b]ut assuming . . . that all Salazar thought was, hey, we're just going to scare these guys or we're just going to fistfight, at most, if you believe that—and you have gang members in a gang territory, going looking for enemies of the gang, and that they're the wrong race, that all they're going to do is fight with them, but that it's foreseeable that someone might get killed, then you can be guilty of murder even if you only went there to fight or thought you were going to fight."

Under these circumstances, we cannot conclude beyond a reasonable doubt that the jury based Lara's and Salazar's first degree murder convictions on a finding of direct aiding and abetting.  Thus, we reverse the judgments insofar as they pertain to those convictions (counts 1 and 2).  We remand the matter to the trial court with directions to give the People the opportunity to accept reductions of their convictions to second degree murder or retry them for first degree premeditated murder on the ground Lara and Salazar were direct aiders and abettors.

II

*Sentencing Issues*

A

*Juvenile Offender Sentencing*

Legaspi contends he is entitled to a new sentencing hearing.  He was 17 years old when he committed the offenses, and he asserts his 220-year-to-life sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment of the United States

12

Constitution, which provides:  "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

"To determine whether a punishment is cruel and unusual," and thus violative of the Eighth Amendment, "courts must look beyond historical conceptions to ' "the evolving standards of decency that mark the progress of a maturing society." [Citation.]' "  (*Graham v. Florida* (2010) 560 U.S. 48, 58 (*Graham*).)  " 'Whether a punishment is cruel or unusual is a question of law for the appellate court.' "  (*People v. Em* (2009) 171 Cal.App.4th 964, 971.)

A series of relatively recent opinions has established sentencing rules for juvenile offenders.  In *Roper v. Simmons* (2005) 543 U.S. 551, 578-579 (*Roper*), the United States Supreme Court held that under the Eighth Amendment juveniles may not be sentenced to capital punishment for any crime.  Five years later in *Graham*, *supra*, 560 U.S. 48, that court held the Eighth Amendment prohibits states from sentencing juveniles convicted of nonhomicide offenses to life in prison without the possibility of parole.  (*Id.* at p. 75.)  The court concluded that "when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability.  The age of the offender and the nature of the crime each bear on the analysis."  (*Id.* at p. 69.)

In *Graham*, the court noted "*Roper* established that because juveniles have lessened culpability they are less deserving of the most severe punishments.  [Citation.]  As compared to adults, juveniles have a ' "lack of maturity and an underdeveloped sense of responsibility" '; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.' "

13

(*Graham*, *supra*, 560 U.S. at p. 68, quoting *Roper*, *supra,* 543 U.S. at pp. 569-570.)  The court relied on studies showing that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds.  For example, parts of the brain involved in behavior control continue to mature through late adolescence.  [Citations.]  Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults."  (*Graham*, at p. 68, quoting *Roper*, at p. 570.)

In *Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455] (*Miller*), the court held that in homicide cases, the "Eighth Amendment forbids a sentencing scheme that *mandates* life in prison without possibility of parole for juvenile offenders."  (*Id.* at p. 2469, italics added.)  *Miller* explains:  "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences.  It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional.  It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.  Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys."  (*Id.* at p. 2468.)  *Miller* explains that although *Graham* was a nonhomicide case, "none of what [*Graham*] said about children—about their distinctive

14

(and transitory) mental traits and environmental vulnerabilities—is crime specific. Those features are evident in the same way, and to the same degree, when . . . a botched robbery turns into a killing. So *Graham's* reasoning implicates any life-without-parole sentence imposed on a juvenile." (*Id.* at p. 2465.)

*Miller*, however, does not foreclose a life sentence without parole in a homicide case for " 'the rare juvenile offender whose crime reflects irreparable corruption.' " (*Miller*, *supra*, 132 S.Ct. at p. 2469, quoting *Roper*, *supra*, 543 U.S. at p. 573.) The court cautioned that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon," and in imposing such a sentence the trial court must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller*, at p. 2469.)

In *People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*), the California Supreme Court, citing *Graham* and *Miller*, reversed a 110-year-to-life sentence for three counts of premeditated attempted murder with gang and firearm enhancements. The court held that sentencing a juvenile for a nonhomicide offense "to a term of years with a parole eligibility date that falls outside [his] natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment," because the sentence is the "functional equivalent of a life without parole sentence." (*Ibid.*)[8] *Caballero*, at pp. 268-269, directed the trial court on remand to "consider all mitigating circumstances attendant

---

8      *Caballero* defines a de facto life sentence as "a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy." (*Caballero*, *supra*, 55 Cal.4th at p. 268.)

in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board."

The People assert the court properly considered Legaspi's age and other mitigating factors, and alternatively, any arguable constitutional error in imposing a de facto life sentence is harmless because under section 3051, he is entitled to a parole hearing during his 25th year of incarceration.[9] In pronouncing sentence, the court stated: "In the sentencing memo, [the prosecutor] addressed the fact that . . . Legaspi was a juvenile at the time of the [offenses]. Pursuant to . . . Section 3051, he will have the opportunity of parole, and *to the extent that the Court would have any discretion*, based on the cold, calculated murders and attempted murders in this case, the Court believes that the 220-year sentence is the appropriate sentence in this case." (Italics added.)

We conclude section 3051 renders moot any arguable Eighth Amendment error in Legaspi's sentencing. Senate Bill No. 260, under which section 3051 was promulgated, is the Legislature's response to *Graham*, *Miller*, and *Caballero*. The measure's legislative history explains: "The Legislature recognizes that youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of

---

[9]     The effect of section 3051 on juvenile sentencing is currently pending before the California Supreme Court. (*In re Alatriste* (2013) 220 Cal.App.4th 1232, review granted Feb. 19, 2014, S214652, consolidated with *In re Bonilla*, review granted Feb. 19, 2014, S214960.)

16

society.  The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in [*Caballero*] and the decisions of the United States Supreme Court in [*Graham*] and [*Miller*]."  (Sen. Bill No. 260 (2013-2014 Reg. Sess.) ch. 312, § 1, p. 2.)

Subdivision (a)(1) of section 3051 provides that any "prisoner who was under 23 years of age at the time of his or her controlling offense" is entitled to a "youth offender parole hearing."  A juvenile sentenced to a determinate sentence shall receive a hearing during the 15th year of incarceration.  (§ 3051, subd. (b)(1).)  A juvenile sentenced to an indeterminate base term of less than 25 years to life shall receive a hearing during the 20th year of incarceration (§ 3051, subd. (b)(1)(2)), and a juvenile sentenced to an indeterminate base term of 25 years to life, as was Legaspi, shall receive a hearing during the 25th year of incarceration (§ 3051, subd. (b)(1)(3)).

As discussed, *Miller* holds "that *mandatory* life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments' " (*Miller*, *supra*, 132 S.Ct. at p. 2460, italics added).  Recently the United States Supreme Court issued its opinion in *Montgomery v. Louisiana* (2016) 577 U.S. ___ [136 S.Ct. 718] (*Montgomery*) holding that the rule announced in

*Miller* is substantive and must be applied retroactively.[10] (*Id*. at pp. 732-736.) The issue of whether an opportunity for parole is sufficient under *Miller* was not squarely before the court in *Montgomery*. The majority opinion, however, notes that a "State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." (*Id*. at p. 736.)

As an example of a permissible procedure *Montgomery* cites a Wyoming statute that is analogous to section 3051. The Wyoming provision, which like section 3051 became effective after *Miller*, makes any person who committed an offense before reaching the age of eighteen "eligible for parole after commutation of his sentence to a term of years or after having served twenty-five (25) years of incarceration . . . ." (Wyo. Stat. Ann. § 6-10-301 (c) (2013).) Like the Wyoming statute, section 3051 effectively abolishes impermissible mandatory life without parole sentences in California. In this case, given that the crimes were heinous, Legaspi was the direct perpetrator, and he was just shy of his 18th birthday when he committed them, there is no likelihood that had the court more carefully considered his age it would have imposed a sentence under which he would be entitled to a parole hearing *before* his 25th year of incarceration. Under these circumstances, a remand for resentencing would be an idle act. " ' "[A] case becomes moot when a court ruling can have no practical effect or cannot provide the parties with effective relief." ' " (*People v. Gregerson* (2011) 202 Cal.App.4th 306, 321.)

---

10      After *Montgomery* was issued, we requested and received supplemental briefing from the parties on what impact, if any, *Montgomery* has on this appeal.

18

Legaspi contends section 3051 does not moot his Eighth Amendment argument, because the dictates of *Miller* "must be followed at sentencing, not years later by a parole board." Legaspi cites *Caballero,* which held "the state may not deprive [juvenile offenders] *at sentencing* of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future." (*Caballero*, *supra*, 55 Cal.4th at p. 268, italics added.) When *Caballero* was decided, however, there was no legislation in place to ameliorate any Eighth Amendment problem with juvenile offender sentencing. Under section 3051, Legaspi is automatically entitled to a parole hearing during his 25th year of incarceration, during which he will have a "meaningful opportunity to demonstrate [his] rehabilitation and fitness to reenter society." (*Caballero*, at p. 268, italics added.) Subdivision (e) of section 3051 mandates that the hearing provide "a meaningful opportunity to obtain release." Legaspi does not assert a minimum parole eligibility date of 25 years, when he will be approximately 42 years of age, is unconstitutional.

B

*Premeditated Murder*

Lara contends the court erred by sentencing him to indeterminate terms of seven years to life on each of the three attempted premeditated murder convictions. He asserts the court should have imposed three terms of life with the possibility of parole. Salazar joins this argument.

The People concede the point, and we concur. (§ 664, subd. (a).) The error was presumably inadvertent and based on section 3046, subdivision (a), which provides that no prisoner serving a life sentence may be paroled until he or she has served a term of at

19

least seven years. This change has no practical effect on the sentences for counts 3 through 5, but an unauthorized sentence is correctable on review. (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1156, fn. 3.)

C

*Firearm Enhancements*

Additionally, Lara contends the court violated section 654 by sentencing him to a term for the firearm enhancement under section 12022.53 on count 5 for attempted premeditated murder. Legaspi and Salazar join in this argument.

Section 12022.53, "which is also known as the 10-20-life law, prescribes substantial sentence enhancements for using a firearm in the commission of certain listed felonies" (*People v. Oates* (2004) 32 Cal.4th 1048, 1052 (*Oates*)), including murder and attempted murder (§ 12022.53, subd. (a)(1) & (18)). Subdivision (b) of the statute provides for an additional 10-year consecutive term when a principal personally used a firearm in the commission of the crimes; subdivision (c) provides for an additional 20-year consecutive sentence when a principal personally and intentionally discharged a firearm in the commission of the crimes; and subdivision (d) provides for an additional consecutive sentence of 25 years to life when a principal personally and intentionally discharged a firearm in the commission of the crimes, which proximately caused great bodily injury or death. Section 12022.53 applies to Lara and Salazar, as well as Legaspi, because it imposes vicarious liability "on aiders and abettors who commit crimes in participation of a criminal street gang." (*People v. Garcia* (2002) 28 Cal.4th 1155, 1171; § 21022.53, subd. (e)(1).)

20

Additionally, section 12022.53, subdivision (f) provides: "Only one additional term of imprisonment under this section shall be imposed per person *for each crime*. If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment." (Italics added.)

Here, the jury found that a principal used a firearm, and subdivisions (b), (c) and (d) of section 12022.53 applied to the two murder convictions (counts 1 and 2) and the three attempted murder convictions (counts 3 through 5). In conformance with subdivision (f) of section 12022.53, the court sentenced each defendant to five consecutive 25-year-to-life sentences under subdivision (d) of the statute.

Lara asserts that since only four of the five persons on whom Legaspi opened fire suffered great bodily injury or death, the sentence on the firearm enhancement on count 5 under subdivision (d) of section 12022.53 was necessarily based on one of the same injuries that supported the enhancements on counts 1 through 4. He submits that one of the 25-year-to-life firearm enhancements must be stayed under section 654.

Section 654, subdivision (a) provides in part: "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The California Supreme Court has held that section 654 may or may not apply to enhancement sentences based on the circumstances of the offenses. "Often the sentencing statutes themselves will supply the answer to whether multiple enhancements can be imposed. . . . When this

21

is the situation, recourse to section 654 will be unnecessary because a specific statute prevails over a more general one relating to the same subject. . . . [¶] Only if the specific statutes do not provide the answer should the court turn to section 654." (*People v. Ahmed* (2011) 53 Cal.4th 156, 163.)

We conclude section 12022.53 specifies the answer here, and thus we need not consider section 654. Defendants were each convicted of five separate felonies, and they are each eligible for a firearm enhancement on each crime. The only question is whether a subdivision (c) (20 years) or (d) (25-year-to-life) enhancement under section 12022.53 applies to count 5, which was not tied to any victim's great bodily injury or death, but to Puente, who avoided injury.

In *Oates,* a gang member shot at five rival gang members, seriously injuring one of them. He was convicted of five counts of attempted premeditated murder, one for each person in the group at which he fired. The court held that section 12022.53 *required* the imposition of multiple enhancements under subdivision (d) even though only one person was injured. (*Oates*, *supra*, 32 Cal.4th at p. 1056.) The court rejected the argument Lara raises here, that a court "should limit the number of subdivision (d) enhancements imposed 'to the same number of great bodily injuries inflicted.' " (*Ibid.*)

*Oates* explained: "In several respects, the language of section 12022.53 supports imposing multiple subdivision (d) enhancements under the circumstances here. First, by its terms, the subdivision (d) enhancement applies to 'any person' who, 'in the commission of' a specified felony, 'personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death, *to any person other than an*

22

*accomplice*.' (Italics added.) Based on the single injury to Barrera, the requirements of a subdivision (d) enhancement are met as to *each* of [the] defendant's five attempted murder convictions, including those not involving the attempted murder of Barrera; attempted premeditated murder constitutes a specified offense [citation], and in the commission of each offense, [the] defendant 'personally and intentionally discharge[d] a firearm and proximately cause[d] great bodily injury' to a person 'other than an accomplice.' " (*Oates*, *supra*, 32 Cal.4th at p. 1055.) *Oates* noted that the "Legislature knows how to limit enhancements to harm done to a 'victim' when that is its intent," and had it intended to so limit section 12033.53, subdivision (d) it would have said so. (*Id.* at p. 1056)

The court also found it "significant that the Legislature expressly included in section 12022.53 specific limitations on imposing multiple enhancements, but did not limit imposition of subdivision (d) enhancements based on the number of qualifying injuries." (*Oates*, *supra*, 32 Cal.4th at p. 1056.) The court concluded the "enactment of this subdivision shows that the Legislature specifically considered the issue of multiple enhancements and chose to limit the number imposed only 'for each crime,' not for each transaction or occurrence and not based on the number of qualifying injuries." (*Id.* at p. 1057.) The court found "no evidence of a contrary legislative intent," nor "any reason to believe the Legislature simply overlooked the kind of factual scenario at issue here, which is not particularly unusual." (*Ibid.*)

23

Lara does not dispute that if we follow *Oates,* the imposition of multiple enhancements against him under subdivision (d) of section 12022.53 was proper. Rather, he asserts we should disregard *Oates* because it is somehow outdated law. *Oates*, however, has never been overturned, and we are obligated to follow Supreme Court authority. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) We conclude section 12022.53, subdivision (d) authorizes the multiple 25-year-to-life enhancements imposed on defendants on counts 1 through 5.

## DISPOSITION

The judgments are reversed insofar as Lara's and Salazar's first degree premeditated murder convictions are concerned, and the matter is remanded with directions. The People may accept a reduction of the convictions to second degree murder or choose to retry them on the greater offense as direct aiders and abettors. If the People accept a reduction, the trial court shall enter judgments against Lara and Salazar for second degree murder and sentence them accordingly.

We direct the clerk to modify Lara's and Salazar's sentences to reflect terms of life with the possibility of parole for counts 3, 4 and 5, to amend the abstracts of judgments accordingly, and to forward copies of the amended abstracts of judgments to the Department of Corrections. In all other respects, the judgments are affirmed.

BENKE, Acting P.J.

WE CONCUR:


McINTYRE, J.


AARON, J.

25